Judge Madeleine M. Landrieu
hln this products liability action, the plaintiff, Connie Marable, suffered an anoxic brain injury and other permanently *886 disabling injuries when she lost her footing and became pinned underneath the two rear tires of an over-the-road tractor[1] while running alongside the moving vehicle and attempting to turn the ignition key to shut off its engine. The plaintiff will require 24-hour care for the rest of her life and will never regain her former lifestyle. Suit to recover damages was filed on., the plaintiffs behalf. The matter proceeded to trial, after which a jury found the defendants, Daimler Trucks North America (“DTNA”), the manufacturer of the tractor, and Wayne Marable, the owner of the tractor and the plaintiffs husband, liable for the accident, apportioning fault between the two, and awarded damages. The trial court entered judgment in accordance with the jury’s verdict on April 29, 2016. DTNA moved for a judgment notwithstanding the verdict (“JNOV”) on the issues of liability and damages, which the trial court denied on June 18,2016.
12DTNA suspensively appealed the judgment and the trial court’s denial of its motion for JNOV. DTNA also filed an exception of prescription in this court on the ground that the plaintiffs claims against it, filed two years after the date of the accident, had prescribed due to the exoneration at trial of a timely-sued alleged tortfeasor. The plaintiff opposed DTNA’s exception, and the plaintiff filed a motion to supplement the appellate record with Volume One of the record of the legal proceedings by which she was interdicted as a result of her injuries from this accident. Alternatively, the plaintiff also filed a motion to remand the case for trial of the ■ prescription issue only. For the following reasons, we deny DTNA’s exception of prescription; deny the plaintiffs motions to remand and to supplement; affirm the trial court’s judgment denying DTNA’s motion for JNOV on the issue of liability; and affirm the trial court’s judgment denying DTNA’s motion for JNOV on the issue of damages. The trial court judgment adopting the jury’s allocation of fault, ninety percent to DTNA and ten percent to Mr. Marable, is not disturbed on appeal. The trial court judgment is affirmed in all respects.
FACTS AND PROCEDURAL HISTORY
In 2006, the defendant, Wayne Marable, who had been driving commercial trucks since 1987, began a lease-purchase program with his employer, KLLM Transport Services, LLC (“KLLM”), for an 18-wheeler tractor, a 2007 Freightliner Columbia equipped with a 2006 Detroit Diesel Series 60 engine. The tractor was custom manufactured by DTNA, pursuant to specifications submitted to it by KLLM. By the time of the accident sued upon herein in 2012, Mr. Marable was the owner of the tractor, which had been driven over 600,-000 miles.
IsDuring a trip to North Carolina in April 2012, Mr. Marable observed that the clutch on the tractor was slipping. On his way home to Louisiana, he took the tractor to Empire Truck Sales of Louisiana, LLC (“Empire”) for repairs. Empire replaced the tractor’s clutch. Following the repairs, Mr. Marable drove the truck home and parked it in the parking lot of Lowe’s Home Improvement (“Lowe’s”) located on Read Boulevard in New Orleans East, where the tractor remained for several weeks.
On May 14, 2012, Wayne and Connie Marable drove from their home to the Lowe’s parking lot in order for Mr. Mara-ble to prepare his tractor for a trip he was scheduled to make on behalf of KLLM. This was his first trip' on the road in the *887 tractor since the prior clutch repair. According to Mr. Marable, upon arriving at his tractor, he performed his usual pre-trip routine: he got into its cab; checked that its parking brake was engaged; moved the gear shifter from left to right to make sure the transmission was in neutral; and, started the engine. Next, Mr. Marable exited the tractor, with its engine idling in neutral and the park brakes engaged, and began performing the required pre-trip inspection and loading items from his car into the tractor,[2]
As Mr. Marable went to open the tractor’s passenger door, he heard the engine begin to race followed by a loud “pop or bang.” The vehicle began to suddenly move with no one in the cab. Mr. Marable dropped his clothes on the ground and yelled to the plaintiff to open the driver’s side door and shut off the | ignition key in order to kill the engine. The ignition is located to the lower left side of the steering column, and its key can be turned on or off while standing on the ground. As the tractor began to suddenly move forward, the plaintiff ran alongside it in an attempt to turn the key off. In the process, she lost her footing and fell going underneath the truck. The plaintiff was dragged by the tractor for a distance and became pinned face down underneath its rear tires. The tractor eventually came to a stop with its front wheels extending over a curb.
The plaintiff sustained severe and permanently disabling injuries as a result of the accident, including an anoxic brain injury. Consequently, she is in a minimally conscious state, meaning she is minimally aware of her surroundings, but not consciously aware of her condition. She has a tracheotomy, which interferes with her ability to verbally communicate. .The plaintiffs injuries are permanent, and she will require 24-hour care for the rest of her life.
Within one year of .her accident, the plaintiff was interdicted, and a curator and under-curator were appointed to act on her behalf. Thereafter, through her curator, suit was filed on her behalf, originally naming as defendants, Empire and its employee, Curtis Wayne Hudspeth. DTNA, Wayne Marable and KLLM were later added as .defendants by way of .a supplemental and amending petition.[3] As to her claims against DTNA, the plaintiff alleged that pursuant to the Louisiana Products Liability Act, the tractor it manufactured was unreasonably dangerous, both in design and due to an inadequate warning.
In April 2016, the matter proceeded to trial against DTNA and Wayne Marable. The case was tried before a jury over six days from April 4, 2016 toj^April 12, 2016. After deliberating, the jury returned a verdict finding, by a preponderance of the evidence, that Mr. Marable’s tractor manufactured by DTNA “was unreasonably dangerous in its design” and “that the unreasonably dangerous design ... was a proximate cause of the damages sustained by Mrs. Connie Marable.” The jury further determined that Mr. Marable was negligent in connection with his wife’s accident and that his negligence was also a proximate cause of the damages she sustained. The jury apportioned 90% of the fault for *888 the accident to DTNA and 10% to Mr. Marable, and awarded the following damages to the plaintiff:
Past Medical Expenses—$898,775.77[4]
Future Medical & Life Care Expenses— $10,549,399.00
Past & Future Physical Pain & Suffering—$10,000,000.00
Past & Future Mental Pain & Suffering—$10,000,000.00
Past & Future Loss of Enjoyment of Life—$10,000,000.00
Scarring & Disfigurement— $10,000,000.00
On April 29, 2016, the trial court entered judgment in accordance with the jury’s verdict for $51,448,174.77, plus judicial interest from April 17, 2014, the date of judicial demand, until paid, and for all recoverable costs.
DTNA filed a motion for JNOY on May 9, 2016, on the issues of liability and damages urging that the jury’s verdict was manifestly erroneous because: (1) the plaintiff failed to prove the tractor design was unreasonably dangerous because no evidence was presented to establish that DTNA could have foreseen the accident or that the tractor’s design was a proximate cause of her accident, and (2) the jury abused its discretion because a general damages award of forty million dollars is beyond what a reasonable trier of fact could assess for the injuries that left the plaintiff in a minimally conscious state, and the evidence did not support a 1 ^special damages award given the plaintiffs permanently disabling condition and reduced life expectancy. Following a hearing, the trial court denied DTNA’s motion, with oral reasons, and rendered judgment on June 13, 2016. DTNA timely appealed the final judgment of April 29, 2016, and the trial court’s judgment denying its motion for JNOV.
Thereafter, DTNA filed for the first time in this court a peremptory exception of prescription averring that the plaintiffs claims against it, filed more than two years after her accident and resulting injuries, had prescribed.
DTNA’S EXCEPTION OF PRESCRIPTION
The facts pertinent to the resolution of the prescription issue are undisputed. The accident occurred on May 14, 2012. The plaintiff, who was sixty-four years old at the time and was not an interdict, sustained serious injuries in the accident. As a result of these injuries, the plaintiff was temporarily interdicted on September 21, 2012, and permanently interdicted on November 9, 2012, within one year of the date of the accident. On November 9, 2012, a tort suit was filed on the plaintiffs behalf against Empire (which allegedly had negligently repaired the clutch on the tractor shortly before the accident).[5] On April 7, 2014, approximately two years after the accident, the plaintiff filed a Second Supplemental and Amending Petition adding DTNA as a defendant, asserting a products liability claim against DTNA as the manufacturer of the tractor. After trial in April of 2016, a jury found that the plaintiffs injuries were solely caused by the combined fault of DTNA and Wayne Mar-able and found no liability on the part of Empire.
*889 17This finding of no liability on the part of Empire provides the basis for the exception of prescription asserted by DTNA on appeal. Delictual actions are subject to a one-year prescriptive period. La. C.C. art. 3492. This one-year prescription applies to actions brought pursuant to the Louisiana Products Liability Act (LPLA). Div. Place P’ship v. Carl E. Woodward, Inc., 2000-2151, p. 4 (La. App. 4 Cir. 1/16/02), 806 So.2d 912, 915. Prescription is interrupted when the obligee files suit against the obligor in a court of competent jurisdiction and venue, and this interruption continues as long as the suit is pending. La. C.C. arts. 3462 and 3463. When prescription is interrupted against a solidary obligor, the interruption is effective against all solidary obligors. La. C.C. art. 3503.
Because in the instant case the plaintiff did not sue DTNA within a year of the accident, she was relying upon her timely suit against Empire, allegedly a solidary obligor with DTNA, to interrupt prescription against DTNA. However, the exoneration of Empire at trial meant that Empire could no longer be considered a solidary obligor, and, therefore, prescription was never interrupted against DTNA. As this court held in Hernandez v. Chalmette Med. Center: “If... it is determined after trial that there is no joint or solidary obligation, prescription may be successfully asserted by an untimely sued defendant who is cast in judgment.” 2001-0074, p. 5 (La. App. 4 Cir. 8/21/02), 826 So.2d 641, 644 (citing cases).
Louisiana Code of Civil Procedure Article 2163 provides, in pertinent part:
The appellate court may consider the peremptory exception filed for the first time in that court, if pleaded prior to a submission of the case for a .decision, and if proof of the ground of the exception appears of record.
If the ground for the peremptory exception pleaded in the appellate court is prescription, the plaintiff may demand | sthat the case be remanded to the trial court for trial of the exception.
Pursuant to this article, the plaintiff here has filed a motion to remand this matter for trial of DTNA’s exception of prescription. As this court has previously held, the granting of a motion to remand pursuant to Article 2163 is discretionary not mandatory. Hernandez, 2001-0074 at p. 6, 826 So.2d at 645. Generally, this court has found that remand is not necessary when the merits of the prescription issue can be determined from the record on appeal. Id. As explained more fully below, in the present case, we conclude that all facts pertinent to the determination of the prescription issue are established by the record before us. Accordingly, we deny the motion for remand and, for the same reasons, deny the motion to supplement the record with the transcript of the proceedings by which Connie Marable was interdicted.
Because the plaintiff did not file suit against DTNA within a year of the accident and prescription against DTNA was not interrupted by the timely suit against Empire, the action against DTNA is prescribed on its face. The plaintiff, therefore* has the burden of proving that prescription has not run due to an exception, suspension or interruption. See Crosby v. Sahuque Realty Co., Inc., 2012-1537, p. 6 (La. App. 4 Cir. 8/21/13), 122 So.3d 1197, 1201-02.
The plaintiff argues that, pursuant to Louisiana Civil Code article 3492, prescription ceased to run against her when she became an interdict, which occurred within one year of the accident. Louisiana Civil Code article 3492 (with pertinent language highlighted) states:
*890 Delictual actions are subject to a Iterative prescription of one year. This pre■scription commences to run from the day injury or- damage is sustained. It does not run against minors or interdicts in actions involving | permanent disability and brought pursuant to the Louisiana Products Liability Act or state law governing product liability actions in effect at the timé of the injury or damage.
The parties do not dispute that the action against DTNA is one “involving permanent disability” and is “brought pursuant .to the Louisiana Products Liability Act.” Nor do they dispute that Connie Marable became an interdict within one year of the date of the accident. Given these facts, which are established by the record, the .question of whether this action is prescribed turns solely on our interpretation of the meaning of the second sentence of Article 3492, which is .purely a legal issue. The plaintiff argues that under the .plain language of the article, prescription “does not run” against interdicts; therefore, when she became an interdict, prescription against her stopped running. Therefore, the plaintiff argues, the action is not prescribed because prescription will remain tolled as long as she remains an interdict. DTNA counter-argues that the exception created by the second sentence of Article 3492 does not apply to the plaintiff because she was not an interdict-at the time the accident occurred. DTNA argues that the phrase “it [prescription] does not run” actually means “it does not commence to run,” which would limit the application of the exception to cases in which the person on whose behalf the products liability action is filed is an interdict at the time the damage caused by the allegedly defective product is inflicted. DTNA also argues that any other interpretation would create an imprescriptible delictual cause of action, a unique result that the legislature could not have possibly intended in drafting the provision,[6]
|inThe second sentence of Article 3492 was added by amendment of the article in 1992. "See La. Acts Í992, No. 621, § 1. We aré’aware of no jurisprudence interpreting this provision as it applies to interdicts (as opposed to minors). Similarly, our review of the legislative history reveals no discussion of the provision as it would relate to interdicts; the only recorded discussion concerning the proposed amendment relates to minors.[7] However, we need not resort to the legislative history to interpret the code article,
The starting point for the interpretation of any provision of law is the language of the provision itself. Louisiana Dep’t of Agric. & Forestry v. Sumrall, 98-1587, p. 5 (La. 3/2/99), 728 So.2d 1254, 1258. Louisiana Civil Code article 11 provides: “The words of a law must be given their generally prevailing meaning.” Similarly, Louisiana Civil Code article 9 states:
When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.
*891 Interpreting Article 3492 as it is written, we conclude that the words “It [prescription] does not run against... interdicts” can have only one meaning: that prescription did not run, or ceased to run, against the plaintiff at the point she became an interdict. As there is no dispute that the plaintiff was interdicted prior to the time the one-year prescription would have run out, prescription ceased running at- that time, and her claim never prescribed. Under the circumstances h,presented here, we do not need to decide whether the tolling of the prescriptive period was an interruption or a suspension because either was still in effect at the time suit was filed against DTNA, as Connie Marable remains an interdict. .We therefore do not reach that issue.
Accordingly, we deny the exception of prescription asserted by DTNA. In .light of this denial, we deny.Mrs. Marable?s motions to remand and to supplement as moot.
ASSIGNMENTS OF ERROR
On appeal, DTNA asserts the following assignments of error: '
1. The trial court erred as a matter of law in denying DTNA’s motion for JNOV on liability on the grounds that, pursuant to § 9:2800.56 of the Louisiana Products Liability Act, the plaintiff failed to prove: (a) that the tractor’s design was unreasonably dangerous because she presented no evidence that DTNA could have foreseen the accident, and (b) that the tractor’s design proximately caused her accident; and
,2. The trial court erred in denying DTNA’s motion for JNOV on damages on the bases that the jury . abused its discretion by awarding (a) general damages of $40,000,000, which are beyond what a reasonable trier of fact could assess under the circumstances, and (b) special dam-. ages based on the plaintiff living to a normal life-expectancy of 85-years old in light of her permanently disabling condition.
STANDARD OF REVIEW
In a products liability action, whether a defect is unreasonably dangerous in design is a question of fact. Hines v. Remington Arms Co., 94-0455, p. 6 (La. 12/8/94), 648 So.2d 331, 335. he factual findings of a fact-finder will not be disturbed absent manifest error. Arabie v. CITGO Petroleum Corp., 10-2605, p. 4 (La. 3/13/12), 89 So.3d 307, 312; Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The Louisiana Supreme Court has set forth a two-part test for the appellate review of facts: (1) the appellate court must find from the record that there is no -reasonable factual basis for the finding of the factfin-der, and (2) the appellate. court |12must further determine that the record establishes the finding is not clearly wrong or manifestly erroneous. Theriot v. Lasseigne, 93-2661, p. 5 (La. 7/5/94), 640 So.2d 1305, 1310. If the trial court or jury’s findings are reasonable and not clearly wrong in light of the record reviewed in its entirety, the appellate court may not reverse. Arabie, 10-2605 at p. 4, 89 So.3d at 312; Cheairs v. State ex rel. Department of Transp. and Development, 03-0680, p. 14 (La. 12/3/03), 861 So.2d 536, 545; Stobart v. State, through DOTD, 617 So.2d 880, 883 (La. 1993).
The issue to be resolved by the appellate court is not whether the trier of fact was right or.wrong, but whether the factfinder’s conclusions were reasonable. Stamps v. Dunham, 07-0095, p. 3 (La. App. 4 Cir. 9/19/07), 968 So.2d 739, 743. Where there is a conflict, in the testimony, a. jury’s reasonable evaluations of credibili *892 ty and reasonable inferences of fact should not be disturbed upon review, even if the appellate court is convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Rosell, supra at 844,. Similarly, where the testimony of expert witnesses differs, it is the responsibility of the trier of fact to determine which evidence is the most credible. Rando v. Anco Insulations Inc., 08-1163, 08-1169, p. 30 (La. 5/22/09), 16 So.3d 1065, 1088. Consequently, when there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Arabie, 10-2605 at p. 4, 89 So.3d at 312; Stobart, supra at 883. Accordingly, where the trial court judgment is not clearly wrong or manifestly erroneous, the appellate court should affirm. Cenac v. Public Access Water Rights Ass’n, 02-2660, pp. 9-10 (La. 6/27/03), 851 So.2d 1006, 1023.
Louisiana Code of Civil Procedure article 1811 is the authority for a JNOV. It provides that “[t]he motion for [JNOV] may be granted on the issue of liability liSor on the issue of damages or on both issues.” La. C.C.P. art. 1811(F). In Anderson v. New Orleans Public Service, 583 So.2d 829 (La. 1991), the Supreme Court outlined the standard to be used in determining whether a JNOV is proper:
A JNOV is warranted when the facts and circumstances point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be raised in favor of the non-moving party. (Emphasis added).
Id. at 831-832. See also Smith v. State, Dept. of Transp. & Development, 04-1317, p. 12 (La. 3/11/05), 899 So.2d 516, 524-25; Trunk v. Medical Center of Louisiana at New Orleans, 03-0275, pp. 5-6 (La. App. 4 Cir. 12/17/03), 863 So.2d 675, 680-81, reversed on other grounds, 04-0181 (La. 10/19/04), 885 So.2d 534. This rigorous standard is based upon the principle that “[w]hen there is a jury, the jury is the trier of fact.” Joseph v. Broussard Rice Mill, Inc., 00-0628, p. 5 (La. 10/30/00), 772 So.2d 94, 99 (quoting Scott v. Hospital Serv. Dis. No. 1, 496 So.2d 270, 273 (La. 1986)). Thus, a trial court may only grant a JNOV when the evidence overwhelmingly points to one conclusion. Simon v. American Crescent Elevator Co., 99-2058, p. 14 (La. App. 4 Cir. 4/26/00), 767 So.2d 64, 73-74.
In Davis v. Wal-Mart Stores, Inc., 00-0445, pp. 4-5 (La. 11/28/00), 774 So.2d 84, 89, the Supreme Court articulated that the standard of review on appeal for the denial of a JNOV is a two-part inquiry. First, using the same criteria the [ 14trial court uses in deciding whether to grant JNOV as set forth above, the appellate court must determine if the trial court erred. Davis, 00-0445 at p. 5, 774 So.2d at 89; Bigelow v. Crescent Title, L.L.C., 08-0932, p. 6 (La. App. 4 Cir. 10/15/08), 997 So.2d 83, 87. Second, “[a]fter determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV us *893 ing the manifest error standard of review.” Bigelow, 08-0932 at p. 6, 997 So.2d at 87.
Thus, in the instant case, we have applied two overlapping standards of review: the manifest error standard as to the jury-verdict, and the standard for review of a JNOV. Under either standard, applying the same criteria as did the trial judge, we are called to determine whether the facts and inferences point so strongly and overwhelmingly in favor of DTNA that reasonable and fair-minded jurors in the exercise of impartial judgment could not arrive at a contrary verdict. See Anderson, 583 So.2d at 831-832.
DISCUSSION
I. Liability
A. The Louisiana Products Liability Act
The plaintiffs claims against DTNA arise under the Louisiana Products Liability Act (“LPLA”), which provides the exclusive theories of liability for manufacturers for damage caused by their products. La. R.S. 9:2800.52; Reynolds v. Bordelon, 14-2371, p. 6 (La. 6/30/15), 172 So.3d 607, 612; Seither v. Winnebago Industries, Inc., 02-2091, p. 4 (La. App. 4 Cir. 7/2/03), 853 So.2d 37, 40. A manufacturer shall be liable to a -claimant for the damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the ^product by the claimant or another person. La. R.S. 9:2800.54(A). A product may be deemed “unreasonably dangerous” in one of four ways: construction or composition, design, inadequate warning or nonconformity with an express warranty. La. R.S. 9:2800.54(B); Young v. Logue, 94-0585, p. 30 (La. App. 4 Cir. 5/16/95), 660 So.2d 32, 53. A claimant seeking to recover under the LPLA bears the burden of proving the existence of an alleged defect. La. R.S. 9:2800.54(D).
At trial, the plaintiff argued, and the jury found, that the tractor manufactured by DTNA was unreasonably dangerous in design, which was a proximate cause of her damages, and that her damages arose from a reasonably anticipated use of the tractor.[8] On appeal, we must determine whether the jury’s findings that the plaintiff carried her burden of proving the elements of defective design, proximate cause, and reasonably anticipate use, were manifestly erroneous. That is, we must decide, based upon our review of the voluminous record in its entirety, whether the facts and inferences point so strongly and overwhelmingly in favor of DTNA that reasonable and fair-minded jurors in the exercise of impartial judgment could not have arrived at a contrary verdict.
B. Reasonably Anticipated Use of the Product
Under the LPLA, a claimant must initially prove that his damages arose from a reasonably anticipated use of the product. La. R.S. 9:2800.54(A). The LPLA defines the term “reasonably anticipated use” as “a use or handling of a product that the product’s manufacturer should reasonably expect of an ordinary 11fiperson in the same or similar circumstances.” La. R.S. 9:2800.53(7).[9] The standard for deter *894 mining a reasonably anticipated use is an objective- one; ie,, an ordinary person in the same or similar circumstances. Peterson v. G.H. Bass and Co., Inc., 97-2843, p. 5 (La. App. 4 Cir. 5/20/98), 713 So.2d 806, 809. Thus, under the LPLA, a manufacturer is liable only for those uses it should reasonably expect of an ordinary consumer. See Kennedy, John, A Primer on the Louisiana Products Liability Act, 49 La. Law Rev. 565, 586 (1989).
At trial, Wayne Marable testified that, on the morning of the accident, he drove to the Lowe’s parking lot with his wife in order to prepare his tractor for his next long-haul trip for his employer, KLLM, He stated that he followed the same routine he.always follows when he prepares to go on a trip, He climbed inside the tractor, started the engine, put the gear shift in neutral and made sure the park brake was set. He then got out of the cab, leaving the engine idling in neutral, to complete his “walk-around inspection” and to load his gear out of his car into the tractor. ...
DTNA’s expert, Thomas Truss, who was accepted by the court as a certified truck mechanic with expertise related to the diagnosis and repair of trucks, testified that truck operators, prior to leaving on a trip, must complete a pre-trip inspection of the vehicle.[10] This, requires that the operator walk around the vehicle in order to check that the lights, brakes and all of the truck’s safety features on the truck are operable. Mr. Truss testified that it was his understanding that this incident l17occurred during the process of Mr. Mar-able conducting the pre-inspection of his vehicle, a process that is not only expected but required of truck operators to perform before taking their vehicles on the road.
Peter Sullivan, accepted by the court as an expert in “truck mechanics” and given “leeway on accident reconstruction,” testified on behalf of the plaintiff. "He reiterated that the Federal . Motor Vehicle Safety Standards (“FMVSS”) require that truckers perform pre-trip inspections to be in compliance with safety regulations; they have to check the tires, brakes, lights, etc. In his experience, truck drivers routinely park their vehicles in neutral and apply the park brake while they perform the inspection. He explained that one of the reasons truckers allow the truck to idle in neutral is so that air pressure can build up, which is needed in order to be able to drive the vehicle, and that takes several minutes.[11]
Jerry Householder, a licensed engineer in the State of Louisiana for 38 years, also testified on behalf of the plaintiff and was accepted by the trial court as an expert in warnings. ‘ Mr, Householder reviewed DTNA’s driver’s manual for Mr. Marable’s Columbia tractor and testified that the manual sets forth instructions for the operator to follow when conducting his pre-inspection. Specifically, he testified that item 30 on page 11.2 of the manual instructs the operator to “[t]urn on the ignition and start the [vehicle’s] engine”, and to “[l]eave the engine running.” Following the command to start the engine and leave it running, Mr, Householder testified that the manual instructs the operator to per *895 form certain functions located on the outside of the vehicle while the engine is still running.
hsAt the time of Connie Marable’s accident, the trial testimony established that Wayne Marable was performing the required pre-inspection of his tractor before leaving on his trip. As specifically instructed to do in DTNA’s driver’s manual, the engine of the tractor was running and Mr. Marable was set to check that other safety items on the outside of the cab were properly functioning. Based on, this evidence presented to the jury, we cannot say that its determination that the accident and Mrs. Marable’s damages arose out of a “reasonably anticipated use” of the tractor was manifestly erroneous or clearly wrong.
C. Unreasonably Dangerous Due to a Defect in Design
After establishing that the damage arose from a reasonably anticipated use of the product, a claimant alleging the product is unreasonably dangerous in design must prove that at the time the product left the manufacturer’s control, (1) there existed an alternative design that was capable of preventing the claimant’s damage, and (2) the risk avoided by the alternative design outweighed the burden of its adoption by the manufacturer and any adverse effect the alternative design would have on the product’s utility. La. R.S. 9:2800.56. See also Jaeger v. Automotive Cas. Ins. Co., 95-2448, pp. 7-8 (La. App. 4 Cir. 10/9/96), 682 So.2d 292, 297-98. The plaintiff need not prove that an alternative design definitely or completely would have prevented the damage. Rather, the plaintiff must prove that the alterna-five design was significantly less likely to cause the accident than the chosen design, or that the alternative design would have significantly reduced the plaintiffs damages. Thomas v. Sport City, Inc., 31,994, p. 2 (La. App. 2 Cir. 6/16/99), 738 So.2d 1153, 1154; Kennedy, A Primer on the Louisiana Products Liability Act, 49 La. Law Rev. at 597.
|19On appeal; DTNA argues that because an accident like Mrs. Marable’s was “unprecedented” and “unforeseeable,” ie., that the tractor’s engine would “spontaneously shift into gear” causing the unattended tractor to suddenly move,, the jury manifestly erred in its determination that DTNA could have (or should have) foreseen that a different or alternate design of the vehicle would be necessary in order to preyent it. At trial, .both the plaintiffs experts and DTNA’s experts agreed that Wayne Marable’s tractor could not have moved forward unless it was “in gear” and the engine was “running.” The plaintiff presented no evidence, suggesting that the transmission on the tractor “spontaneously shift[ed] into gear" as continuously proposed by DTNA. Instead, the plaintiffs experts presented several possible ways the tractor could have been placed into gear, each of which would have required human intervention.[12] At trial (and on appeal), contrary to DTNA’s contention that it could not havé foreseen the incident, the plaintiffs primary theory of liability was that DTNA knew that the’ operators of its vehicles, while conducting their mandatory pre-trip inspections, would routinely leave the cab of their tractors tmoccupied with *896 the engines running in order to ensure that the safety features on the outside of their vehicles were working properly. Consequently, the plaintiff argued that DTNA’s tractor was unreasonably dangerous in design because DTNA knew or should have known that, if its vehicle was left unattended with the engine running, the tractor could suddenly move 12ftresulting in personal injury. Therefore, according to the plaintiff, regardless of what actually caused Mr. Marable’s tractor to slip into gear, DTNA was hable because an alternative design—dual brakes on the rear drive axles—which was available and routinely used by DTNA in 2006, would have stopped the tractor from moving suddenly and would have prevented this accident.
At trial, the plaintiffs expert, Jerry Householder, testified that DTNA’s driver’s manual pertaining to Mr. Marable’s tractor provides the following warning on page 7.11:
Do not leave the vehicle unattended with the engine running. If you leave the vehicle and the engine is running, the vehicle could move suddenly, which could result in personal injury or property damage. (Emphasis added.)
As noted, DTNA’s driver’s manual also instructs the operators of its vehicles to start the engine while in the cab, to leave it idling, and then to complete the pre-trip inspection by ensuring that the safety features on the outside of the vehicle are in proper working order.
We find that, while DTNA might not have been able to foresee the tractor’s transmission “spontaneously” slipping from neutral into gear, based on the warning and the instructions contained in DTNA’s driver’s manual, there was sufficient evidence for the jury to conclude that DTNA either knew, or should have known, that by instructing its operators to leave the cab of their vehicles, with the engine running, in order to complete the required pre-trip inspection, “the vehicle could move suddenly, which could result in personal injury.” This is exactly what everyone agrees happened in this case: Mr. Marable left the cab of his tractor, with its engine idling as instructed, and as he proceeded to complete the pre-trip | ^inspection, the tractor moved suddenly rolling over his wife and causing severe personal injuries.
Having concluded that the jury was not manifestly erroneous in finding that sudden movement of the tractor was foreseeable by DTNA, we must decide whether reasonable minds could differ regarding whether the plaintiff carried her burden of proving that (1) at the time Mr. Marable’s tractor left DTNA’s control, an alternative design existed that, had it been implemented, could have prevented the sudden movement, and (2) the risk avoided by the alternative design outweighed the burden of its adoption by DTNA and the adverse effect, if any, this alternative design would have on the product’s utility.
1. Alternative Design
The primary alternative design posed by the plaintiff at trial consisted of DTNA equipping the tractor with two sets of park brakes, one on each of the tractor’s rear drive axles, as a standard feature rather than a buyer’s option. The plaintiff argued at trial that dual park brakes could have prevented Mr. Marable’s tractor from suddenly moving after it slipped into gear. On appeal of the jury’s finding of liability, DTNA contends that the evidence adduced at trial overwhelmingly showed that dual park brakes would not have stopped Mr. Marable’s tractor from moving forward once it had slipped into gear.
Anthony “Tony” Moore, a former employee of DTNA for nearly 40 years, retired as the director of engineering for braking and active safety systems on all of *897 the vehicles that DTNA manufactured. Mr. Moore was accepted by the trial court as an expert in “heavy truck design” over the plaintiffs objection that he was not a 12glicensed professional engineer.[13] Mr. Moore testified that DTNA manufactured Mr. Marable’s 2007 Freightliner Columbia in June 2006 for his employer, KLLM (and the tractor’s original owner), in accordance with KLLM’s specifications pursuant to a Truck Sales Order (“TSO”). Mr. Moore explained that upon receipt of a TSO from a customer, DTNA would review the specifications to determine whether it could complete the order in compliance with all regulations. One of his responsibilities in working with DTNA was to determine how many sets of spring brakes were to be included on the various trucks DTNA manufactured and to ensure that the brake systems it placed on its trucks met all federal and state requirements. According to Mr. Moore, if the vehicles DTNA-manu-factured met the minimum required Federal Motor Vehicle Safety Standards (“FMVSS”),[14] the truck was considered to be a reasonably safe vehicle and could be sold.
Mr. Moore explained that DTNA designed Mr. Marable’s tractor with three axles—a -front steering axle and tandem drive axles in the rear—and three sets of brakes: service brakes, emergency brakes and parking brakes. He stated the purpose of the parking brake is not to slow the vehicle down, but rather, the purpose in the design and the intent of the parking brake or “park brake” is to be able to hold the vehicle (hold the wheels in a locked position) when it is parked. The park brake has to be able to hold mechanically with no external force (ie., noj^air pressure, in case there is no air in the lines or there is a leak in the lines).[15] According to Mr. Moore, the only requirement of the park brake is that it be able to hold the vehicle when it is parked at its gross vehicle weight rate.[16]
Mr. Moore testified that at the time Mr. Marable’s tractor was manufactured, it was one in a group of 35 tractors that were all custom-built for KLLM with the identical specifications, including a single set of park brakes.[17] According to Mr. Moore, at *898 the time of its manufacture, the tractor’s standard configuration consisted 'Of a single set of park brakes located on the first rear drive axle. Mr. Moore explained that, at the customer’s option, a second set of park brakes could have been purchased and included on the second rear drive axle. Mr. Moore acknowledged, that in 2006, when DTNA manufactured Mr. Marable’s tractor with a single set of park brakes, DTNA also routinely manufactured the same or similar tractors with dual park brakes on the rear drive axles.
According to Mr. Moore, DTNA had never heard of a situation in which one of its vehicles had moved forward with no one in the cab, or ofie in which' a manual transmission, like that on Mr. Marable’s tractor, had self-shifted (without an external manipulation by a human being ■ or another object) after it had been idling in apparent neutral for several minutes. Additionally, he testified that he had never heard of a situation where the auxiliary transmission, or the “back, box,” had forced [ 24the tractor’s transmission into gear as a : result of air pressure rising.[18] He stated that even if one of the above situations had occurred previously, neither situation had ever been brought to the attention of DTNA, thus, there was no way DTNA could have foreseen the need for an alternative design that would prevent such situations from occurring.
Moreover, Mr. Moore testified that the park brakes on Mr, Marable’s tractor functioned as DTNA designed them to function—as the evidence suggests the single park brake held the wheels on the second axle in the locked position. He testified specifically that the design of the park brake is intended to permit the vehicle’s operator to overpower or drive through the park brakes if necessary in an emergency. Therefore, none of the park brake systems DTNA offers are intentionally designed; to. stall the.engine whenever the park brakes are applied.[19] Mr. Moore opined that.tractors with a single axle park brake, system are not defective or unreasonably dangerous, because they are safe, reliable, meet all ^Federal Motor Carrier and state regulations, are standard in the industry, and are. what DTNA’s customers routinely request.
Lastly, Mr. Moore opined that even if Mr. Marable’s tractor had been equipped *899 with two sets of park brakes instead of one, when the tractor unexpectedly went into gear and suddenly moved, two park brakes would not have prevented the truck from moving forward because they would not have been able to withstand the power of the engine even in the lowest-gears. In sum, Mr. Moore opined that Mr. Marable’s tractor was not unreasonably dangerous in design because the proposed alternative design consisting of two sets of park brakes would not have prevented the tractor from moving forward when it slipped into gear and, thus, would not have prevented the plaintiffs injury.
Gerald Rosenbluth, an expert in the field of automotive technology specializing in the area of industrial design and technology, testified on behalf of the plaintiff. Contrary to Mr. Moore, he opined that Mr. Marable’s tractor was defective in design and unreasonably dangerous due to DTNA’s failure to incorporate two park brakes, one on each drive axle, as standard equipment when the tractor was manufactured in 2006.[20] Though he conceded that Mr. Marable’s tractor met all FMVSS requirements at the time it was manufactured by DTNA, Mr. Rosenbluth opined that had DTNA incorporated park brakes on both of the tractor’s rear drive axles as standard equipment, thereby doubling the braking effectiveness and efficiency to the second drive axle, this design would “more likely than not have reduced, minimized, and/or prevented ... the accident and 12ijin,juries” suffered by the plaintiff in this case. Like Mr. Moore, Mr. Rosenbluth based his opinion upon a series of tests he had conducted to substantiate his conclusion, which tests were explained in detail to the jury at trial. Thus, according to Mr. Rosenbluth, regardless of what had caused Mr'. Marable’s tractor to slip into gear, having two sets of-park brakes would have prevented the vehicle from moving forward and injuring the plaintiff.
Peter Sullivan, the plaintiffs expert truck mechanic, explored various explanations as to how Mr. Marable’s tractor had shifted into gear, including potential problems in the tractor’s transmission and the clutch, but found no defects, and thereby ruled out a mechanical problem that might have contributed to the accident. Mr, Sullivan explained that given the design of Mr. Marable’s tractor—a single set of park brakes on the first drive axle with no brakes on the second .axle—when Mr. Marable engaged the park brake on the first drive axle, the wheels on that axle did not rotate, but because there was no park brake on the second rear drive axle, .the drive shaft continued to spin, turning the gears on that axle, and pushing the wheels along on the front axle. While Mr. Sullivan couid offer no exact explanation as to how Mr. Marable’s tractor ultimately shifted into gear, and conceded that if it had done so spontaneously (which he denied that it could) such would be “unprecedented,” he opined that, regardless of the cause, a second set of park brakes would “very close to” have doubled the brake retardation force and, thereby, reduced the ability of the tractor to move.
, Kevin Bedsworth, accepted by the court as an expert in mechanical engineering, commercial vehicle brake systems and accident reconstruction, particularly as applied to transmission and braking, completed a full accident reconstruction investigation in this case on a similar Freightliner in order to [ ¡^determine what could have caused transmission on Mr. Marable’s tractor to *900 go into gear.[21] Mr. Bedsworth described the testing he did, which caused him to rule out the possibility that the transmission of Mr. Marable’s .tractor had “jump[ed]” into gear or that the gear shifter had “bumped” into gear. And although Mr. Bedsworth could not state exactly what had caused the gear shifter to move into gear, based on the tests calculations he performed, he concluded that if Mr. Marable’s tractor been equipped with park brakes on both rear drive axles, the accident could not have happened, as neither the starter nor the idling engine would have had the power to overcome the additional resistance needed to move the vehicle forward.[22] According to Mr. Bedsworth, “[t]he one thing that eliminates every single one of [the proposed theories] is to install a second set of [park] brakes” because it doubles the braking force of the truck and would have prevented this accident from occurring no matter the theory of how the shifter bumped into gear.
The jury heard and considered the conflicting assertions presented by the experts and apparently accepted the testimony of the plaintiffs experts as being more credible. Therefore, we cannot say that the plaintiff failed to present factual support sufficient to show that the use of an effective alternate design would have prevented this accident. There was evidence indicating that dual park brakes on each of the drive axles would have been more effective in preventing this accident than the single set of park brakes that Mr. Marable’s tractor had, which did not | ^prevent the tractor from moving forward. Based on the conflicting expert testimony presented to the jury, we do not find that the evidence points so overwhelmingly in favor of DTNA that reasonable minds could not have reached different conclusions regarding whether the plaintiff satisfied her burden of proving that an alternative design was known by, and available to, DTNA when it manufactured Mr. Marable’s truck in 2006, and that the proposed alternative design would have prevented the accident and-her injuries.
2. Rislo-Utility Balancing Test
The LPLA also requires that the plaintiff establish that the risk avoided by the alternative design outweighed the burden of its adoption by DTNA and the adverse effect, if any, this alternative design would have on the product’s utility. Put another way, in the instant case, in order to prove that Mr. Marable’s tractor was unreasonably dangerous due to a defect in design, the plaintiff not only had to show there was an available alternative design that would have prevented her damages, she also had to demonstrate that the likelihood and gravity of her damages created by the risk of not having dual park brakes outweighed the burden to DTNA to incorporate dual park brakes into the tractor’s design, and outweighed any adverse effect dual park brakes might have on the utility of the tractor.
Testimony at trial established that at the time DTNA manufactured Mr. Mara-ble’s tractor, the tractor’s suggested retail *901 price was $120,000.00. According to Tony Moore, at that time customers could opt to purchase an additional set of park brakes for the second drive axle at a cost of approximately $50.00-60.00 to DTNA and $138.00 to the consumer. Thus, while the burden to DTNA was minimal, DTNA argued that incorporating the additional set of park brakes would adversely affect the utility of the tractor and its intended purpose and would create pother hazardous consequences, which outweighed the risk that the tractor’s engine would inexplicably slip into gear causing the tractor to suddenly move and cause personal injury. Specifically, Mr. Moore testified that adding a second set of park brakes would have increased the chances of overheating and a brake fire, and would have caused the tractor to skid, jackknife, and lose power steering when the brakes were applied in an emergency.
The jury heard and considered the evidence relative to the risk-utility balancing required to prove the tractor was defective in design because of the lack of an additional set of park brakes. Based upon our review of the record, we cannot say that the jury was clearly wrong or manifestly erroneous in finding that the risk of an accident such as the plaintiffs outweighed both the burden to DTNA of incorporating dual brakes and any adverse effect or potential hazardous conditions posed by such a design.
D. Proximate Cause
Under the LPLA, the plaintiff also bore the burden of proving that the tractor’s defective design was the proximate cause of the accident and her damages. George v. Housing Authority of New Orleans, 04-2167, p. 6 (La. App. 4 Cir. 6/29/05), 906 So.2d 1282, 1286. A “proximate cause” is generally defined as “any cause which, in natural and continuous sequence, unbroken by an efficient, intervening cause, produces the result complained of without which the result would not have occurred.” Sutton v. Duplessis, 584 So.2d 362, 365 (La. App. 4 Cir. 1991). If there is more than one cause of injury, a defendant’s conduct is a cause-in-fact, or proximate cause, if it is a substantial factor generating the plaintiffs harm. Rando, 08-1163, 08-1169 at p. 31, 16 So.3d at 1088. A jury’s lanfinding of proximate causation is subject to the manifest error standard of review. Id.
DTNA argues that although the plaintiff may have shown that, but for the lack of additional park brakes the tractor would have stopped, preventing her damage, she failed to present any evidence to prove proximate causation, i.e., that her injuries were a foreseeable result of the defect. Specifically, DTNA contends that the plaintiff failed to demonstrate that “DTNA should have foreseen that the tractor would shift spontaneously into gear.” DTNA further argues that the unknown event that caused the tractor to shift into gear was an “intervening cause,” which, according to DTNA, is the death knell of the plaintiffs liability claim against it. We disagree. Although there was no evidence at trial establishing why the tractor suddenly slipped into gear, there was ample evidence to establish that DTNA knew the tractor could potentially move forward if it were left idling with the cab unoccupied.
From this evidence, the jury could have—and obviously did—conclude that this accident was a reasonably foreseeable consequence of manufacturing a tractor with a single set of park brakes. At trial, Wayne Marable testified that he was unaware that the park brake on his tractor was insufficient to hold the vehicle still, with its engine idling, while he performed the outside portion of his pre-trip inspection. According to Mr. Marable, had he *902 known this, he never would have left the cab unattended with the engine idling, even with the park brake engaged. Additionally, James Michot, qualified by the court as an expert trucker, testified on behalf of the plaintiff that he has been around trucks all of- his life, and, until this case, he never knew that a single set of park brakes on the tractor’s front drive axle would not hold the vehicle. However, DTNA’s expert, Tony Moore, testified that |mDTNA did know the tractor could move through a single set of park brakes on only one drive axle, which was an intentional design. Moreover, the warning in DTNA’s driver’s manual established that DTNA anticipated that the tractor could move suddenly if its cab was left unattended with the engine idling, which could result in personal injury. Accordingly, the jury’s determination that the plaintiff satisfied her burden of proving that a single set of park brakes on the tractor was a proximate cause of her harm was not manifestly erroneous or clearly wrong.
In denying DTNA’s motion for JNOY on liability, the trial court reasoned that expert testimony was presented to the jury suggesting that “because the truck shifted and because there was the potential for the truck to shift into gear,” the accident would not have happened, and it was the jury’s responsibility to determine whether or not some action on the part of DTNA could have prevented the tractor from doing so. In this regard, the trial court noted that nine of the twelve jurors determined by a preponderance of the evidence that it was more probable than not that the design of DTNA’s truck was unreasonably dangerous and that its unreasonably dangerous design was the proximate cause of the damages sustained by the plaintiff. Specifically, the trial court stated:
... I’m not inclined to reverse the jury, I’m not inclined, I am a finder of fact and the jury is a finder of fact. We put before the jury the law applicable to the facts. It is my appreciation that the jury found fact[s] sufficient -to support [its] verdict. Whether I agree with it or disagree with it-is not my litmus test. My litmus test in this case whether the finders of fact made an error that is sufficient to overturn their verdict, and I don’t see any errors sufficient for me to overturn the verdict .,. ■
After reviewing the record in its entirety in a light most favorable to the plaintiff, we find that the facts and circumstances of this case do not point so strongly and overwhelmingly in favor of DTÑA that reasonable jurors, in the [ ^exercise of impartial judgment, could not have determined that the plaintiff met her burden, of proving DTNA’s liability under the LPLA. Accordingly, the trial court properly denied DTNA’s motion for JNOV on the issue of liability. For the same reasons, we conclude that the jury’s determination of -liability on the part of DTNA is not manifestly erroneous.
II. Damages
DTNA argues that the amounts of general and special damages awarded to Connie Marable are excessive. According to DTNA, “the jury’s natural sympathy for the plaintiff rather than the evidence of her injuries and her minimally conscious state” resulted in the general damage award of $40,000,000.00, and the special damages award of $10,549,399.00 for future medical and life care expenses. DTNA contends ' these awards are unprecedented, grossly excessive, and are not supported by the law or evidence. Consequently, DTNA argues the damage awards constitute an abuse of discretion by the jury and must be reduced. We disagree.
It is well-settled that a jury is given great discretion in its assessment of *903 quantum, both special and general damages. Louisiana Civil, Code article 2324.1 provides: “In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury.” The discretion vested in a trier of fact’s assessment of the appropriate amount of general damages is “great,” even vast, and is entitled to great deference on review such that an appellate court should rarely disturb an award review. Wainwright v. Fontenot, 00-0492, p. 6 (La. 10/17/00), 774 So.2d 70, 74; Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993). “Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the | aaappellate court may-feel that its own evaluations are as reasonable. Pierre v. Tulane Univ., 07-0600, p. 2 (La. App. 4 Cir. 12/19/07), 984 So.2d 734, 735. “When findings are based on determinations regarding the credibility of witnesses, the manifest error/clearly wrong standard demands great deference to the trier of fact’s findings.” Id. “Only the fact finder can be aware of the variations in demeanor and tone of voice that, bear so heavily on the listener’s Understanding and belief in what is said.” Id, “Reversing the trial court’s findings of fact requires the appellate court to find that the findings are not supported by a reasonable factual basis and that the record demonstrates that -.the findings are clearly wrong,” Keller v. Monteleon Hotel, 09-1327, p. 2 (La. App. 4 Cir. 6/23/10), 43 So.3d 1041, 1042.
“[T]he appellate court’s disagreement with the trial court, alone, is not grounds for substituting its judgment for that of the trier of fact.” Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La. 1990). “If the ... jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even‘though- convinced that had-it been sitting as the trier of fact, it would have weighed the evidence differently.” Id.
A. Connie Marable’s Injuries
It is undisputed that . Connie Marable suffered severe, debilitating, and permanent physical injuries as a result of the accident. She will require 24-hour residential care for the rest of her life and will never regain her former lifestyle. At trial, Wayne Marable described in detail how his wife suffered during the accident, explaining that after he saw the tractor begin to roll forward and pick up speed, he noticed his wife chasing after it. At some point he could see that she lost her footing, and when that happened, he saw his wife fall and go under the tractor’s fuel tank. While he expected to ■ see her come out from underneath the tractor, she |s,tnever did. As the tractor continued to move across the parking lot, it dragged her along uri-derneath it. When the tractor eventually came to a stop, its “tires were wedged on the left side ... [She] was pinned [face-down] to the ground.-The tires were on top of her, [two] of them [were] mashing her side to the ground.” Mr. Marable immediately called 911 and assured Connie that help was op the way. He recalls her looking up to him.and saying the last words he would ever hear her speak,. “Oh God, please get this off of me,” after which she lost consciousness and went into prolonged cardio-respiratory arrest.
Shortly after the accident, Connie was transported by emergency personnel to the Trauma Center at University Hospital in New Orleans. During transport, she required defibrillation to restore her heart to a normal rhythm. Upon arrival, she was treated for an anoxic brain injury[23] and *904 other catastrophic injuries, including: a crushed pelvis; a crushed hip; collapsed lungs (or bilateral pneumothorax); ongoing seizures; bilateral corneal hemorrhages; a fractured sternum; a comminuted angulated left humerus fracture; cecum herniation through her abdominal muscles; cardiac 'arrest; respiratory arrest; anemia; a deep multilayer medial thigh laceration connected to a deep and open knee laceration; multiple broken fingers; de-gloving injuries to her arm, hand, posterior elbow, and upper leg;[24] and a large wound behind her knee. She initially required an endotracheal breathing tube, a PEG feeding tube, two chest tubes, a subclavian catheter, and a Foley catheter. Currently, she requires a tracheostomy breathing tube and a nasogastric feeding tube. Connie continues to suffer with ongoing seizures, [astremors, urinary tract infections, pneumonias, and muscle contractures. Additionally, as a result of her injuries, she has had to undergo and endure numerous painful treatments, multiple surgeries, painful debridement, and multiple hospital stays.
At trial, the plaintiff presented the testimony of Dr. Shelly Savant, a board certified physician in neurology and psychiatry, who was qualified as an expert in Life Care Planning. While not the plaintiffs treating physician, Dr. Savant testified that she had examined Connie Marable on two separate occasions and had reviewed all of her medical records. Dr. Savant initially evaluated the plaintiff approximately one year after the accident, at which time she observed that the plaintiff had visual fixation. Based on this observation, Dr. Savant opined the plaintiff to be in a “minimally conscious state” or “MCS,” versus a “persistent vegetative state” (“PVS”).[25] According to Dr. Savant, a person in a MCS is alert and awake, but only partially aware of her environment. She testified that persons in a MCS such as Connie Marable tend to live longer than persons in a PVS. Dr. Savant testified that the plaintiff requires “24/7 attendant care and supervision” because she is completely dependent, bedridden, and unable to communicate. The plaintiff has no bowel or bladder control and is incapable of taking care of her most basic needs without assistance. Due to her immobility, the plaintiff needs to be turned every two hours to help prevent bed sores from developing. According to Dr. Savant, the plaintiffs condition is permanent.
lafiB- Jury’s Award of Special Damages
Special damages are those which theoretically may be determined with reasonable mathematical certainty, including medical costs and life care expenses. Kaiser v. Hardin, 06-2092, p. 11 (La. 4/11/07), 953 So.2d 802, 810.[26] A plaintiff meets this burden by establishing “the probability of futuré medical expenses with *905 supporting medical testimony and estimations of their probable costs.” Menard v. Lafayette Ins. Co., 09-1869, p. 12 (La. 3/16/10), 31 So.3d 996, 1006. In reviewing a jury’s factual conclusions with regard to special damages, an appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court’s conclusions, and (2) the finding must be clearly wrong. Kaiser, 06-2092 at pp. 11-12, 953 So.2d at 810; Guillory v. Ins. Co. of North America, 96-1084, p. 5 (La. 4/8/97), 692 So.2d 1029, 1032.
At trial, the plaintiff called Dr. Savant to testify as to the plaintiffs medical condition, her future medical needs, and her life expectancy. Dr. Cornelius Gor-man, the plaintiffs expert medical life care planner, testified regarding the.life care plans he had prepared on behalf of the plaintiff. Dr. Gorman submitted three different life care plans to the jury, based on assumptions that the plaintiff would survive to ages 74,. 79, and 85, respectively.[27] Each plan was created using a “cost analysis” prepared by Dr. Gorman in response to the “needs analysis” developed by Dr. Savant. Ralph Litolff, Jr., the plaintiffs expert in forensic accounting, ^testified regarding his calculations as to what amount it would presently take to provide the annual cost of caring for the plaintiffs medical and personal needs based on a life expectancy of 85 years.[28] Although DTNA cross-examined the plaintiffs expert witnesses, DTNA did not present any independent expert testimony.
While the exact medical services and level of care that Connie Marable will require in the future do not appear to be contested, at issue on appeal is her reasonable life expectancy and, consequently, the duration of her need for this care. While Dr. Savánt testified that she believed Mrs. Marable would liye to the age of 74, she further stated that Connie Marable’s life expectancy “depends on God’s plan.” Dr. Savant further testified that Mrs. Mara-ble’s level of care would factor into her life expectancy. When asked whether Connie Marable could live to the age of 85, a normal life expectancy according to current actuarial tables, Dr. Savant stated that it was certainly a possibility that she' could live that long, especially if she were to receive a “premium” level of care.
. In short, though Dr. Savant believed it was more likely that Connie Marable would .live to age 74, she also testified that the higher the level of care Mrs. Marable received, the longer she would likely live, even possibly to age 85.[29] Accordingly, we *906 find the jury’s factual determination that Connie Marable could.live to the age of 86 is reasonably supported by the evidence and, thus, is not | asclearly wrong or manifestly erroneous. Based upon this factual finding, we conclude that it was within the province of the jury to adopt Dr. Gorman’s life care plan for an 86-year life span. Having reviewed the record before us in its entirety, and considering all of the evidence in the light most favorable to the plaintiff, because we find that reasonable jurors, exercising impartial judgment, could have reached different conclusions as to whether Connie Marable could live to the age of 86, we affirm the jury’s findings and its aw.ard of $10,549,399.00 for future medical costs and life care expenses.
C. Jury’s Award of General Damages
“General damages” are those which ,are inherently speculative .in nature and may not be fixed with mathematical certainty; instead, they, “involve mental or physical pain or, suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of lifestyle that cannot be definitively measured in monetary terms.” Duncan, 00-66 at p. 13, 773 So.2d at 682.
The initial inquiry in reviewing an award of general damages is whether the trier of fact abused its discretion in assessing the amount. Cone v. National Emergency Servs., Inc., 99-0934, p. 8 (La. 10/29/99), 747 So.2d 1085, 1089. The reviewing court must evaluate the particular injuries and their effects on the particular injured person. Reck v. Stevens, 373 So.2d 498, 501 (La. 1979). Only after a determination that the trier of fact has abused its “much discretion”' is a resort to prior awards appropriate and, then, only for the purpose of determining the highest or lowest point that is reasonably within that discretion. Wiltz v. Brothers Petroleum, L.L.C., 13-332, p. 43 (La. App. 5 Cir. 4/23/14), 140 So.3d 758, 786; American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429, 433-434 (La. 1991). If the trier of-fact awarded excessive damages, the | ^reviewing court can “disturb the award ... only to the extent ,,. of ... lowering it ., to the highest ,,. point which is reasonably within the discretion afforded that court.” Wingfield v. State ex rel. Dept. of Transp. and Development, 01-2668, p. 27 (La. App. 1 Cir. 11/8/02), 835 So.2d 785, 806 (citing Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La. 1976)).
The plaintiffs son, William “Bill” Jones, IV, and her daughter-in-law of nearly 24 years, Tanya Saufcier, testified as to the active social and family life the plaintiff led up to the day before the accident. The testimony evidenced that she and her husband traveled and enjoyed an active lifestyle. Mr. Jones described • the very close relationship he shared with his mother prior to her accident. He spoke of trips the plaintiff took an)d the time she spent with her grandchildren, describing how she regularly participated in each of their school and extracurricular activities. Mr. Jones testified that his mother currently resides in a care facility in Baton Rouge, and because of the distance and time constraints of his job, he is only able to visit her for several hours twice a week. While Dr, Savant expressed doubt as to whether or not his mother is aware of her condition, Mr. Jones testified that his mother has been abl¿ to recognize him, she has cried, and has made several attempts to verbally communicate with him.
. Ms. Saucier testified that, prior to the accident, Mrs. Marable was very active in the lives of her two, grown children, her six grandchildren, and her extended, family. Mrs. Marable often took on the responsibility of cooking for large holiday meals. According to Ms. Saucier, the family gath *907 ered for a weekly visit every Sunday and would often watch the Saints’ football games together. She described the plaintiff as having been very active and involved in her church and in her family.
UnThe jury was shown several clips from a “day in the life” video depicting Mrs. Marable daily routine in the care facility. The short clips included instances of Wayne Marable cleaning her tracheosto-my; checking and cleaning her feeding tube, manipulating her limbs, and of both Mr. Marable and Mr. Jones turning her in the bed, which has to be done every two hours throughout the day and evening.
After considering the evidence presented, the jury awarded Connie Marable $30,000,000.00 for her past and future physical pain, mental pain and loss of enjoyment of life. The severity of Mrs. Mara-ble’s injuries and the extent of her suffering were not disputed. A general damage award is based on both the extent and severity of the injuries and the duration. The record establishes that Mrs. Marable was 64-years old at the time of the accident, 69-years old at the time of trial and may live to the age of 85, or longer. The evidence at trial established that, at the time of the accident, Connie Marable was enjoying her recent retirement, traveling with her husband, regularly attending family gatherings, and constantly involved in the busy lives of her grandchildren. Because of the permanently disabling injuries she sustained in the accident, Connie Mar-able’s life was instantaneously and forever altered due to no fault of her own. Further, because of her minimally conscious state, which was determined to be permanent, she will never be able to enjoy these things again.
Based on the severity and extent of Connie Marabíe’s injuries, and the jury’s finding that she would likely continue to endure pain and suffering for many more years, we, cannot say that the jury’s award of general damages for her past and future physical pain, mental pain, and loss of enjoyment of life was excessive. The jury also awarded Connie -Marable $10,000,000,00 for the scarring and disfigurement she suffered as a result of the accident. Given the evidence j ^regarding her extensive degloving injury and her resulting scars and disfigurement, we do not find that this award is so excessively high as to shock the conscience. Indeed, Connie Marable’s injuries shock the conscience. Accordingly, we do not disturb the jury’s award for general damages.
CONCLUSION
For the foregoing reasons, DTNA’s exception of prescription is denied; the plaintiffs motions to remand and to supplement are denied; the trial court’s judgment denying DTNA’s motion for JNOV on the issue of liability is affirmed; and, the trial court’s judgment denying'DTNA’s motion for JNOV on the issue of damages is affirmed. The trial court judgment reflecting the jury’s allocation of fault, ninety percent to DTNA and ten percent to Mr. Marable, is not disturbed on appeal. The trial court judgment is affirmed. ’
AFFIRMED
LOBRANO, J., CONCURS IN PART, DISSENTS IN PART, AND ASSIGNS REASONS

. An "over-the-road” tractor is a tractor that pulls a tractor-trailer.

. In a sworn statement taken on the day of the accident, Mr. Marable did not mention his getting into the cab of the tractor prior to starting the engine. At trial, he testified that he inadvertently omitted this fact as it was something he automatically always, did before starting the tractor’s engine and performing the pre-trip inspection. Though the engine could be started by an operator while standing on the ground outside of the tractor, Mr. Marable denied that this is how he started the engine on the morning of the accident.

. KLLM settled with the plaintiff prior to trial.

. The parties stipulated to the amount of the plaintiff’s past medical expenses.

. Wayne Marable first filed suit on November 7, 2012, which was later dismissed, without prejudice, on November 14, 2013, due to the fact that his temporary curatorship had expired, Once his curatorship was reinstated, he filed the instant suit on November 9, 2012.

. We note that the interpretation of the provision urged by DTNA also would arguably create an imprescriptible delictual action where , the injured party was an interdict at the time the injury occurred and the other criteria of the provision were met,

. While wé recognize that, in relation to prescription, minority is inherently different from interdiction because minority inevitably ends and interdiction generally persists throughout the remainder of a person’s lifetime, the legis- ■ lature’s apparent- failure to consider this distinction has no, bearing upon our.interpretation of the Codal provision, as explained infra.

. The plaintiff also argued that the tractor manufactured by DTNA was unreasonably dangerous due to an inadequate warning. Because the jury determined DTNA's tractor was unreasonably dangerous in its design, which was a proximate cause of the plaintiffs damages, they did not reach the issue of warning and it has not been raised by DTNA as an issue on appeal.

. This definition of "reasonably anticipated use” is narrower in scope than the pre-LPLA standard, "normal use.” The term “normal use" included all reasonably foreseeable uses *894 and misuses of a product. Butz v. Lynch, 99-1070, p. 6 (La. App. 1 Cir. 6/23/00), 762 So.2d 1214, 1218.

. Mr, Truss was' originally retained by KLLM to investigate tire cause of the accident, His investigation included a full inspection of the tractor and its component parts, including the transmission and the clutch.

. Park brakes are not applied like service brakes. They apply when air pressure leaves the brake chamber and release when air pressure builds up in the chamber.

. The plaintiff presented evidence at trial that it was possible that Mr. Marable started the tractor’s engine by standing on the ground outside of the cab, though he denied this. The plaintiff also presented testimony suggesting that while he was transferring items from his car into the cab, Mr, Marable may have accidently or inadvertently bumped or knocked the gear shifter causing the transmission to go into gear. The plaintiff argues that the jury heard this testimony and must have believed it in part based on their allocation of ten percent of the fault for the accident to Mr. Marable.

. While he has been hired as an engineer, claims to have worked as an engineer for 40 years, has been responsible for engineering departments, has had engineers work for him, and considers himself to be an engineer, Mr. Moore has never been qualified by any state under any professional engineering association. He earned a bachelor’s of science degree in Industrial Technology and Automotive Technology and has an associate’s degree in applied science in auto diesel technology.

. FMVSS require that all manufacturers self-certify all of their vehicles, which means that as a manufacturer, DTNA is stating that each of the vehicles it manufactures will pass the FMVSS and that it has documentation to validate that each vehicle it manufacturers will meet the required standards.

. Mr. Moore testified that if the normal service brake system and the emergency brake systems both failed, one could use the parking brake to slow the vehicle. Specifically, the operator could pull a yellow knob situated on the vehicle’s dash, which is labeled “park brake,” and any air that remained in the two spring brake chambers would be exhausted, that would allow the mechanical springs to apply and the set of brakes on the number 2 axle would immediately apply.

. There is a requirement for how much force the park brake has to be able to hold, but it is stationary with the vehicle shut off and it is parked, hence why it is referred to as a "parking brake."

. According to Mr. Moore, there are up to 900 different modules or variables included on the TSO from which a customer can choose, and the customer is responsible for configuring the vehicle according to his needs for operation. Mr. Moore testified that from 1998 to 2007, KLLM purchased from DTNA 2,844 vehicles of the same class as Mr. Mara-ble’s and with the same specifications—including a single set of park brakes.

. At trial, DTNA’s expert, Thomas Truss, posited the theory that a malfunction of the tractor's transmission as a result of an anomaly in the air solenoid in the auxiliary, transmission caused the vehicle to go into gear and move forward—a phenomenon that even Mr, Truss had never before heard of happening. Mr. Truss agreed with Mr. Moore that "nobody" had ever seen "[a] situation where- a [tractor] was idling for a period of time and then made itself go forward.” At trial, Mr. Truss opined that negligent maintenance work by Empire, occurring during its repair and ultimate replacement of Mr. Marable’s clutch, could have contaminated the transmission, causing it to spontaneously shift into gear when the air pressure built up. Despite this theory, Mr. Truss testified that he had not seen or heard of anything like this happening during his lifetime of automotive and heavy truck repair.

. According to Mr. Moore, for example, if an emergency situation occurs while the operator is driving the tractor on the highway and he applies the park brake, if the engine were . to automatically stall when the park brake was applied (which could potentially happen if there were park brakes on both rear drive axles instead- of the one axle), the operator would have no engine-power, no power steering and vehicle instability, which would create a danger not only for the driver but for the other vehicles on the road. With only one park brake on the second axle, while its wheels would lock when the park brake was applied, the wheels on the third axle would continue to rotate and.the operator would still have the ability to move the vehicle forward, rather than the engine dying.

. At • trial, DTNA objected to Mr. Rosen-bluth's qualifications and expertise to give opinions regarding the defectiveness of DTNA’s design of the truck on the grounds that such an opinion was outside the scope of his training in automotive technology,

. Mr. Bedsworth was originally retained by Empire Trucks to determine what factors from an accident reconstruction perspective could have been involved in this case, especially in light of the fact that the clutch on Mr. Marable’s tractor had been replaced shortly before the accident.

. On cross-examination, Mr. Bedsworth acknowledged that he had never actually tested his theory on the exemplar truck (i.e., installing park brakes on each of the two rear drive axles, putting the tractor into gear, starting the engine, letting it idle for a period of time, and then letting up the clutch to see what happened), and he could give no explanation as to why this test was not conducted.

. An anoxic brain injury occurs when the blood supply is interrupted and the brain is deprived of oxygen. Examples of anoxic brain *904 injuries include a "partial drowning” and "birth canal oxygenation deprivation.”

. A degloving injury is a type of avulsion (action of pulling or tearing away), in which an extensive section of skin is completely torn off the underlying tissue severing its blood supply. It is named by analogy to the process of removing a glove.

. A MCS is one in which a person has severe brain damage and is only able to produce subtle and intermittent signs of consciousness. A MCS is distinguished from a "persistent vegetative state," or "PVS,” in which there are, by definition, no signs of consciousness, although one in a PVS may exhibit many automatic behaviors, such as opening and closing the eyes, a wandering gaze, and facial movements.

.The parties stipulated to the amount of past medical expenses that Connie incurred, which included her immediate treatment, as well as the surgeries she underwent until the time of trial.

. The amount of future medical costs and life care expenses awarded to the plaintiff was based on a life care plan that assumed a normal life expectancy of age 85. Dr. Gor-man's expert report, admitted into evidence, provided that "[m]odification of life expectancy to age 74 yields an adjusted Option II [neurorehabilitive care] Grand Total will be $4,000,614.20. Midpoint calculation to age 79 yields adjusted Option II Grand Total of $6,500,999.80.”

. Mr. Litolff testified that the present value of future medicals in a neurorehabilitation facility, “the Cadillac plan,” based on a normal life expectancy to age 85, which was the age supplied to him by Dr. Gorman, totaled $10,549,399.00. This is the amount the jury awarded to the plaintiff.

.Dr. Savant’s reference to "premium” care is the same level of care referred to as "the Cadillac plan” by Mr. Litolff. According to the testimony of the plaintiff’s son, Connie was not receiving that—the highest level of care— at the time of trial. He testified that he did not believe Capitol House (the facility where Connie Marable resided at the time of trial) is the best facility for the care his mother really needs, but it is a sufficient facility. He stated that there are other facilities that he would prefer her to be in.