# Supreme Court of Louisiana

The Opinions handed down on the **19th day of December, 2024** are as follows:

**BY Crichton, J.**:

2023-C-00788

BARBER BROTHERS CONTRACTING COMPANY, LLC VS. CAPITOL CITY PRODUCE COMPANY, LLC; FRANK CUSHENBERRY; AND XYZ INSURANCE COMPANY C/W FRANK CUSHENBERRY AND ROBIN CUSHENBERRY, INDIVIDUALLY AND ON BEHALF OF THE MINOR CHILDREN, NOAH CUSHENBERRY AND KHLOE CUSHENBERRY VS. JOHNNY SCOTT AND BARBER BROTHERS CONTRACTING COMPANY, LLC
(Parish of East Baton Rouge)

AFFIRMED AS AMENDED AND RENDERED. SEE OPINION.

Weimer, C.J., dissents in part and assigns reasons.

Knoll, J., additionally concurs and assigns reasons.

Crain, J., dissents and assigns reasons.

McCallum, J., dissents.

Griffin, J., additionally concurs for the reasons assigned by Knoll, Justice Pro Tempore.

**BARBER BROTHERS CONTRACTING COMPANY, LLC**

**VS.**

**CAPITOL CITY PRODUCE COMPANY, LLC; FRANK CUSHENBERRY; AND XYZ INSURANCE COMPANY**

**C/W**

**FRANK CUSHENBERRY AND ROBIN CUSHENBERRY, INDIVIDUALLY AND ON BEHALF OF THE MINOR CHILDREN, NOAH CUSHENBERRY AND KHLOE CUSHENBERRY**

**VS.**

**JOHNNY SCOTT AND BARBER BROTHERS CONTRACTING COMPANY, LLC**

*On Writ of Certiorari to the Court of Appeal, First Circuit, Parish of East Baton Rouge*

On Rehearing

**CRICHTON, J.[1]**

We granted plaintiffs' application for rehearing to reconsider our decision in *Barber Bros. Contracting Co., LLC v. Capitol City Produce Co., LLC*, 2023-00788 (La. 6/28/24), 388 So.3d 331 ("*Barber I*"), for the purpose of re-examining the general damage and loss of consortium awards, clarifying the application of *Pete v. Boland Marine and Manufacturing Company, LLC*, 2023-0170 (La. 10/20/23), 379 So. 3d 636, and correcting a scribe error in the fault assessment. In all other respects, rehearing is denied.

In this suit, plaintiffs, Frank Cushenberry and his family, sought damages from Barber Brothers Contracting Company, LLC ("Barber Brothers") for injuries sustained in a vehicular accident that occurred on Interstate 10 in LaPlace, Louisiana. In *Barber I*, we addressed three issues. First, we concluded the trial court's failure

---

[1] Justice Jeannette Theriot Knoll, retired, appointed Justice *Pro Tempore*, sitting due to the vacancy in Louisiana Supreme Court District 3.

to comply with La. Code Civ. P. art. 1793(B) by not instructing the jury on the duties imposed pursuant to La. R.S. 32:125, and/or its failure to instruct the jury on the obligations of a commercial driver, like Mr. Cushenberry, did not constitute reversible error. That holding is not changed in this opinion on rehearing.

Second, we found the jury manifestly erred in finding Barber Brothers solely at fault in causing the accident and assessing no fault to Mr. Cushenberry. That holding is not changed in this opinion on rehearing. Relatedly, *Barber I* also adjusted the fault allocation, assessing Mr. Cushenberry with 20 percent of the fault. On rehearing, we correct the scribe error in *Barber I*[2] and find that the *lowest* amount of fault that a reasonable factfinder could have assessed Mr. Cushenberry is 20 percent. Accordingly, Barber Brothers' fault is reduced to 80 percent.

Third, *Barber I* reviewed the damage awards under *Pete*, 2023-0170, 379 So. 3d 636. We concluded that the jury abused its discretion in awarding general damages to Mr. Cushenberry and found the highest amount that reasonably could be awarded was $5,000,000.00. On rehearing, we find, pursuant to the analysis announced in *Pete*, 2023-0170, 379 So. 3d at 645, that considering prior awards in similar cases along with the particular facts and circumstances of this case reflected in its strong, supportive record, the jury did not abuse its discretion when it granted Mr. Cushenberry $10,750,000.00 in general damages.

---

[2] In *Barber I*, the section addressing fault concluded,

> While both Mr. Scott and Mr. Cushenberry each bear a degree of responsibility for the accident, based on our review of the record, we find that the *highest* amount of fault that a reasonable factfinder could have assessed Mr. Cushenberry is 20 percent, and the lowest amount of fault that a reasonable factfinder could have assessed to Barber Brothers is 80 percent.

*Barber I*, 2023-0788, pp. 24–25, 388 So.3d at 351 (emphasis added). The correct application of *Clement v. Frey*, 1995-1119 (La. 1/16/96), 666 So.2d 607, called for Mr. Cushenberry's percentage of fault be adjusted only to the extent of raising it to the *lowest* point which was reasonably within the jury's discretion. Our prior conclusion that Mr. Cushenberry's portion of fault is 20 percent remains unchanged.

2

In *Barber I*, based on a review of relevant prior cases, we also found that the jury abused its discretion in awarding loss of consortium damages of $2,500,000.00 to his spouse, Robin Cushenberry, and $1,500,000.00 to each of their minor children, Noah and Khloe. That holding as to the jury's abuse of discretion is unchanged on rehearing. We further found the highest amounts that could be reasonably awarded were: $400,000.00 in loss of consortium damages to Mrs. Cushenberry and $100,000.00 to each child. On rehearing, for reasons discussed below, we conclude those awards were in error and find the highest awards reasonably within the jury's discretion for loss of consortium are $1,000,000.00 to Mrs. Cushenberry and $500,000.00 each, to Noah and Khloe.

As amended, the trial court judgment remains affirmed. Our reasons on rehearing follow.

## DISCUSSION[3]

In its original briefing, Barber Brothers contended that the jury abused its discretion in awarding general damages of $10,750,000.00 to Mr. Cushenberry and loss of consortium of $2,500,000.00 to Mrs. Cushenberry and $1,500,000.00 each to Noah and Khloe, the minor children. Barber Brothers maintained the awards were grossly excessive, not supported by the evidence, and disproportionate to past awards for truly similar injuries. We agreed and ultimately reduced the awards.

On rehearing, plaintiffs argue the majority erred in reducing the damage awards. Specifically, they assert that *Barber I* overlooked the particularities of Mr. Cushenberry and how he and his family have been impacted by his injuries. We agree. We provide the following revised abuse of discretion analysis under *Pete*, 2023-0170, 379 So. 3d 636, as to the general damage award to Mr. Cushenberry[4]

---

[3] We incorporate the facts and procedural history from *Barber I* and, therefore, do not repeat them here.

[4] As noted above, we do not alter our holding in *Barber I* as to the loss of consortium awards.

and amend our finding as to the highest loss of consortium awards reasonably within the jury's discretion.

It is well-settled that appellate courts "have a constitutional duty to review the law and facts and thereafter render a judgment on quantum based on the merits," including "determining whether the jury has abused its 'much discretion' . . . in awarding general damages." *Carollo v. Wilson*, 353 So. 2d 249, 252 (La. 1977) (citing La. Const. art. V, § 10 (B), which provides, in pertinent part, that "appellate jurisdiction of a court of appeal extends to law and facts.").

This court has long recognized that "[r]easonable persons frequently disagree about the measure of general damages in a particular case." *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La. 1993). "The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award." *Id.*, 623 So.2d at 1261. "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award." *Id.*

General damage awards must not be "obviously the result of passion or prejudice, and they [should] bear a reasonable relationship to the elements of the proved damages." *Youn*, 623 So.2d at 1261. "To reduce the trier of fact's award, [a reviewing court] must conclude from the entirety of the evidence viewed in the light most favorable to the plaintiff, that a rational trier of fact could not have fixed the awards of general damages at the level set by the trial judge or that this is one of those 'exceptional cases where such awards are so gross as to be contrary to right reason.'" *Davis v. Hoffman*, 00-2326, p. 3 (La. App. 4 Cir. 10/24/01), 800 So.2d 1028, 1030 (quoting *Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 331 (5th

4

Cir. 1987); *see also Youn*, 623 So.2d at 1261. In summary, to find abuse of discretion warranting the disturbance of a factfinder's award of general damages, a reviewing court must find that the award is "so high or so low in proportion to the injury . . . that it shocks the conscience." *Baack v. McIntosh*, 2020-1054 (La. 6/30/21), 333 So.3d 1206, 1215 (quoting *Riley v. Maison Orleans II, Inc.*, 01-0498, p. 11 (La. App. 4 Cir. 9/25/02), 829 So.2d 479, 487).

Prior to this Court's decision in *Pete*, attempts to offer guidance in determination of what "shocks the conscience" provided little objective criteria beyond the codal "much discretion" being left to the judge or jury. *See* La. C.C. art. 2324.1. In *Pete,* this Court appropriately recognized that the consideration of "past awards in evaluating whether an award is an abuse of discretion" "provides a reasonable criterion by which courts can evaluate awards for general damages, whether for excessiveness or insufficiency." *Id.*, 2023-0170, p. 8, 379 So.3d at 643. As observed in *Barber I*, realizing that '[n]o two cases will be identical," the *Pete* court cautioned that "a review of prior awards is not the only factor to be considered in evaluating whether a general damage award is an abuse of discretion" and explained that "[t]he review of prior awards will simply serve to illustrate and supply guidance in the determination of damages." *Barber I*, 2023-0788, p. 25, 388 So.3d at 352 (quoting *Pete*, 2023-0170, p. 9, 379 So.3d at 643). The *Pete* court emphasized that other factors such as "the facts or circumstances particular to the case under consideration,"[5] that is, "the particular injury to the particular plaintiff under the particular circumstances"[6] must always be considered as well. Clearly, prior awards in truly similar cases are a touchstone in the review performed by the appellate courts. Thus, under *Pete*, "to determine whether a trier of fact abused its discretion

---

[5] *Id.*, 2023-0170, p. 9, 379 So.3d at 644 (quoting *Malta v. Herbert S. Hiller Corp.*, 2021-0209, p. 32 (La. 10/10/21), 333 So. 3d 384, 408).

[6] *Id.*, 2023-0170, p. 9, 379 So.3d at 643 (quoting *Youn*, 623 So.2d at 1261).

in its award for general damages, an appellate court is to consider the particular facts and circumstances of a case, in conjunction with a review of prior awards. This applies to claims of excessiveness as well as insufficiency in an award." *Id.*, 2023-00170 p. 10, 379 So.3d at 644.

Accordingly, in *Pete*, this court incorporated "a reasonable criterion" into a reviewing court's determination of whether an award is abusively high or low based on what has been done through the decades in practice by attorneys in estimating the value of a case and by courts in assisting in the determination of whether an award shocks the conscience so as to constitute an abuse of discretion. *Id.*, 2023-0170 p. 8, 379 So.3d at 643.

Taking these principles into account, *Pete* concisely summarized the required two-step analysis for appellate review of a damage award: (i) determining whether abuse of discretion occurred by examining the particular facts and circumstances of the case under review while including a "consideration of prior awards in similar cases," and (ii) if abuse of discretion is found, "the court is to then also consider those prior awards to determine 'the highest or lowest point which is reasonably within that discretion.'" *Id.*, 2023-0170, p. 10, 379 So. 3d at 644 (quoting *Jones v. Mkt. Basket Stores, Inc.,* 2022-0841, p. 16 (La. 3/17/23), 359 So. 3d 452, 464).

With this framework in mind, we begin by reexamining the thorough record in this case. As set forth in *Barber I*,[7] the record indicates that Mr. Cushenberry sustained extensive physical injuries and a traumatic brain injury in the accident. Dr. Patrick Greiffenstein, a trauma surgeon at LSU Health Sciences Center University Medical Center ("UMC"), treated Mr. Cushenberry upon his arrival at the hospital following the accident. According to Dr. Greiffenstein, Mr. Cushenberry sustained craniofacial injuries, including a fractured eye socket and left cheek bone, a double

---

[7] While this is largely duplicative of the information contained in *Barber I*, we repeat it here to properly explain our revised *Pete* analysis. On rehearing, no party disputed the summary of Mr. Cushenberry's injuries.

fracture to the mandible, and a dislodged maxilla. The soft tissue damage caused significant facial swelling that impaired his ability to breathe, so he had to be intubated. In addition to the craniofacial injuries, Mr. Cushenberry sustained cervical spine and shoulder injuries. Noting that Mr. Cushenberry required a blood transfusion and developed a severe respiratory infection while in the intensive care unit, Dr. Greiffenstein described him as being in critical condition and at risk of dying for several days following the accident.

Dr. Mark Stalder, a UMC plastic and reconstructive surgeon, testified that he operated on Mr. Cushenberry two days after the accident. Dr. Stalder described Mr. Cushenberry's face as being "grossly unstable" at that point, such that he had no use of his throat, mouth, or tongue. Dr. Stalder reconstructed Mr. Cushenberry's face, which required peeling back the facial and cranial skin and using screws to anchor the reconstruction of the eye socket and mandible. When he stitched the skin back in place, Mr. Cushenberry was left with a significant scar. As a result, Mr. Cushenberry later underwent two "painful" laser scar revision procedures under general anesthesia.

Dr. Kevin McCarthy, a board-certified orthopedic surgeon specializing in spine-related conditions and pain management, treated Mr. Cushenberry for his cervical spine injury after his discharge from UMC. According to Dr. McCarthy, additional diagnostic tests indicated Mr. Cushenberry had not sustained a fracture to C1, as initially thought, but he had a herniation at C5-6. Although Dr. McCarthy could not say for certain that the herniation occurred in the accident, in his opinion, the symptoms (pain and discomfort) from the herniation were related to the accident. Dr. McCarthy further testified that an MRI of the lumbar spine indicated no herniations or nerve compression in the lower back. To treat the C5-6 herniated disc,

7

Dr. McCarthy performed epidural steroid injections and endoscopic rhizotomies[8] on the neck. Because Mr. Cushenberry obtained only temporary relief from these procedures, Dr. McCarthy recommended – and Mr. Cushenberry eventually underwent – an anterior cervical discectomy with a fusion. Dr. McCarthy opined that Mr. Cushenberry's shoulder injury exacerbated his neck pain, so he referred him to Dr. Gerard Murtagh, an orthopedic surgeon specializing in shoulder injuries.

Dr. Murtagh diagnosed Mr. Cushenberry as having a torn rotator cuff and torn labrum of the left shoulder. He performed an arthroscopic debridement and capsule labral stabilization on the shoulder. Although Mr. Cushenberry had extensive physical and rehabilitative therapy post-surgery, he developed adhesions, fibrosis, and restricted range of motion, requiring a second surgical debridement. According to Dr. Murtagh, Mr. Cushenberry continues to experience pain in the neck and shoulder. He opined Mr. Cushenberry has an eight percent (8%) total body disability given the limited range of motion of the left arm; he cannot lift anything above the shoulder.

Regarding the brain injury, Dr. Jeffrey Lewine, a neuroscientist, and traumatic brain injury expert, testified Mr. Cushenberry suffered both direct and secondary brain injuries. He explained that the head trauma resulted from the brain repeatedly striking the skull cavity due to linear acceleration and rotational forces, otherwise known as primary injury forces. The primary injury forces cause damage to brain cells and to axons ("the initial injury") which sets into motion a cascade of metabolic, hemodynamic, and biochemical events that takes minutes, days, weeks, and months to develop ("the secondary injury"). The initial injury impaired Mr. Cushenberry's frontal lobes, which sit above the orbit where the skull curves and are responsible

---

[8] Rhizotomy is a minimally invasive surgical procedure to remove sensation from a painful nerve by killing nerve fibers responsible for sending pain signals to the brain. The nerve fibers can be destroyed by severing them with a surgical instrument or burning them with a chemical or electrical current. *See* Johns Hopkins University Medicine, "What is rhizotomy?," *available at* https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/rhizotomy.

for motor function, problem solving, judgment, impulse control, and social and sexual functions. Additionally, Mr. Cushenberry sustained damage to his temporal lobes, which are behind the ears and responsible for processing auditory information, encoding memory, processing emotions, language, and visual perception. Dr. Lewine testified that Mr. Cushenberry's computer-generated brain images taken after the accident show an abnormally large volume of brain tissue in some areas as well as an abnormally smaller volume in other areas. He opined that Mr. Cushenberry has a two to four-fold increased risk for developing neurodegenerative diseases, including dementia and Alzheimer's disease, due to the brain injury.

Dr. Patricia Morgan, Mr. Cushenberry's treating neurologist, testified the frontal lobe damage resulted in changes to Mr. Cushenberry's personality, cognitive abilities, and memory capacity. Mr. Cushenberry underwent a 60-day inpatient rehabilitation treatment at Advantage Healthcare Rehabilitation Therapy in New Orleans. Following inpatient treatment, Mr. Cushenberry's mental status improved, his verbal I.Q. increased, and his visual memory improved. Dr. Morgan noted Mr. Cushenberry has residual problems with anxiety, depression, and insomnia, which she treated with various medications. Like Dr. Lewine, Dr. Morgan opined that Mr. Cushenberry is at significantly higher risk of developing dementia and Alzheimer's disease.

Dr. Susan Andrews, a licensed neuropsychologist, began treating Mr. Cushenberry six months after the accident. The results of the initial tests conducted on Mr. Cushenberry indicated deficits in his language function, verbal comprehension, attention, comprehension, memory, concentration, and executive function.[9] They showed difficulties with visual/fine-motor coordination in both

---

[9] The term "executive function," as used in psychology, is "the group of complex mental processes and cognitive abilities (such as working memory, impulse inhibition, and reasoning) that control the skills (such as organizing tasks, remembering details, managing time, and solving problems) required for goal-directed behavior." "Executive Function," Merriam Webster (updated Oct. 2024), *available at* https://www.merriam-webster.com/dictionary/executive%20function.

hands and an inability to control emotion. Dr. Andrews attributed these deficits and problems to the frontal lobe damage. She tested Mr. Cushenberry two years later and the results indicated significant improvement in verbal communication, fine motor coordination in both hands, visual memory, and immediate memory; however, deficits in executive function, processing speed, and language function remained. According to Dr. Andrews, the frontal lobe damage resulted mainly in a permanent change in Mr. Cushenberry's personality; he has lost his motivation, initiative, interest in doing things he previously enjoyed and is depressed. In her words, "[Frank] had both the flat affect of the depression because he recognized how much he could not do anymore, coupled with the fact that he also just wasn't motivated any longer. He didn't have the get-up-and-go initiative, the energy, the ability to organize things to do in his life." Dr. Andrews explained that the brain trauma adversely affected Mr. Cushenbery's "self-image." He is extremely self-conscious about his physical appearance, particularly his facial scars and hair loss, and wears a hoodie and cap to hide them in public.

As to how the injuries impacted his life, Mr. Cushenberry testified that he is no longer the person he used to be. He described himself as happy, easy going, peaceful and outgoing before the accident. He was the person his friends and family came to for advice, help and financial assistance. Mr. Cushenberry testified that his wife and children are the joy in his life, and he is their biggest cheerleader. From the time Noah was five years old until the accident, Mr. Cushenberry coached Noah's little league football and baseball teams; Noah was 11 years old at the time of the accident. He brought Khloe to her weekly dance class and often danced ballet with her. Athletic his entire life, Mr. Cushenberry enjoyed playing in adult basketball and softball leagues. He took pride in his physical appearance prior to the accident. At home, Mr. Cushenberry cut the grass, did laundry, cooked regularly, and loved to entertain family and friends.

Mr. Cushenberry considered his co-workers and customers at Capitol City Produce his "extended family." Before the accident, he went to work each day at 3:30 a.m., loaded his truck, helped others load theirs, and then delivered produce to his customers. Mr. Cushenberry believed he had the perfect job because it allowed him to "kiss [his] wife and kids [before he left] in the morning" and be home in the afternoon when the kids returned from school. He took great pride in being recognized at work for following the rules and doing a good job. Mr. Prejean, the director of operations at Capitol City Produce, described Mr. Cushenberry as a model employee who consistently exceeded expectations at work. His friendly personality made him popular with his co-workers and customers alike.

Mr. and Mrs. Cushenberry were actively involved in their non-denominational church, Present Truth Prayer Center, for more than fifteen years. They attended Sunday and Wednesday night services, served as greeters, and participated in various ministries. Their pastor, Reverend Randy Smith, testified that he could always call on Mr. Cushenberry for anything the church needed.

Mr. Cushenberry testified everything has changed since the accident. He can no longer work or engage in the activities he once enjoyed. He feels like he is a burden to Mrs. Cushenberry because he can no longer help with the kids, clean house, or cook. Mr. Cushenberry is sad because he can no longer play with his kids, coach Noah's teams or dance with Khloe. He describes himself as angry, irritable, and depressed much of the time. He experiences daily pain and headaches and is often frustrated because he can no longer remember things. According to Mr. Cushenberry, he and Mrs. Cushenberry often argue now because she wants to travel and go places, while he prefers to stay home and avoid social gatherings because he is embarrassed by his appearance.

Despite these changes since the accident, Mr. Cushenberry acknowledged that he still can care for himself in many respects. He stands and walks unassisted. He

can shower, dress, and use the toilet by himself. Mr. Cushenberry testified that he drives a car and runs errands for his wife around town. He explained that he babysits the kids by himself and still attends some of their activities, including Noah's football practice. Since the accident, he has also enjoyed vacations and excursions with his family.

Mrs. Cushenberry testified that, prior to the accident, her husband was outgoing and fun to be around. He often organized dinners and parties for family and friends to share the foods he prepared. She described Mr. Cushenberry as the "go to person" everyone called upon and he helped anyone in need. She also described him as an outstanding father to Noah and Khloe. They absolutely adore their father, and he is "the favorite" parent. Mrs. Cushenberry said that, prior to the accident, her husband engaged in physical activities with both kids. He would get on the ground with Noah to show him how to tackle and he would dance ballet with Khloe. He motivated and challenged the kids to be their very best. However, due to his constant pain since the accident, he now rarely engages in physical activity with the kids, and he is impatient, irritable, and fussy.

Nonetheless, Mrs. Cushenberry still considers Mr. Cushenberry to be a loving husband. She testified they have always had a strong marriage, and he still tries to help her with the house and children. Prior to the accident, Mr. Cushenberry cooked regularly. Now with his memory impaired, Mrs. Cushenberry no longer allows him to cook for fear he will forget to turn off the stove or grill. He can no longer cut the grass or do any heavy lifting. According to Mrs. Cushenberry, Mr. Cushenberry has longed to return to college to obtain a degree in education so he could one day teach and coach in the local schools. Knowing that is no longer an option, he is angry and frustrated. Since the accident, Mrs. Cushenberry testified, she sometime feels like she has "three kids." However, she believes "[h]e's still a great husband. He's just – just not as – he's not what he was before."

Captain Jamaal Carter of the St. Gabriel Police Department, a childhood friend of Mr. Cushenberry, described him as funny, outgoing, always happy and "always there" when you call. Noting the close bond between Mr. Cushenberry and his kids, Captain Carter testified Mr. Cushenberry is a man whose family is everything to him and a dad who is always excited to do things with his kids. He also testified the accident has changed his friend. Mr. Cushenberry calls him all hours of the night complaining of the constant pain and has confided that it has put a strain on his marriage. Captain Carter testified that he now cuts the grass and does other tasks Mr. Cushenberry is no longer able to do around the home.

William Cushenberry, Mr. Cushenberry's uncle, testified that his nephew was an outstanding athlete who played multiple sports, excelled at all of them, and earned a football scholarship to Grambling University. He described his nephew as a "jokester" who loved to tease his sisters and play around with his kids. He has observed a change in his nephew's personality since the accident. He described his nephew as distant and "looking off into space." His nephew no longer jokes and is forgetful, angry, and irritable. William Cushenberry said the accident robbed the children of their father because they no longer enjoy activities with him. He also said his nephew's marriage and self-esteem have suffered because Mrs. Cushenberry is now solely responsible for their family.

Continuing with the first step in the two-step *Pete* analysis, we now examine the general damage awards in cases involving similar injuries, while acknowledging that no two cases are identical. With the particular facts and circumstances of Mr. Cushenberry's case in mind, we consider the following similar cases as a factor in determining whether the award is so excessive as to constitute an abuse of discretion. *Pete*, 2023-0170, p. 10, 379 So.3d at 644.

In *Brewer v. J.B. Hunt Transport, Inc.*, 2009-1408 (La. 3/16/10), 35 So. 3d 230, the plaintiff sustained significant injuries after he rear-ended an 18–wheel

tractor-trailer that slowed down suddenly and changed lanes unexpectedly. He suffered a traumatic injury to his right anterior temporal lobe which resulted in bed-wetting, seizures, short-term memory deficits, a lowered I.Q., changed personality and disinhibition – problems which required long-term treatment at a brain-injury facility. In addition, he sustained more than fifty facial fractures, fractures to his right femur, left elbow, and finger. He had a torn spleen, necessitating removal, and two tears in his colon. He was hospitalized for thirty days in a comatose state, assisted by an artificial ventilator, and feeding tube. Brewer suffers from uncontrolled facial twitching and can no longer straighten his right arm. This Court affirmed the jury's award of $2,500,000.00. *Id.*, 2009-1408, p. 2, 35 So. 3d at 233.

We also consider *Jenkins v. State ex rel. Dep't of Transp. & Dev.*, 06-1804 (La. App. 1 Cir. 8/19/08), 993 So. 2d 749, where the appellate court affirmed a jury award of $3,000,000.00 to a plaintiff who was rendered unconscious in an accident, underwent brain surgery for a subdural hematoma, and suffered rib fractures, spinal cord bruising, bulging and herniated discs of the lumbar and cervical spine, permanent hearing loss in one ear, vision problems (blurred vision, cranial nerve trauma), daily headaches, neck and back pain.

In *Sabillon v. Max Specialty Ins. Co.*, 13-0513 (La. App. 4 Cir. 3/12/14), 137 So. 3d 707, the plaintiff was injured when, while delivering cargo to a warehouse, a load fell from a forklift and struck a piece of lumber which went airborne and struck the plaintiff in the head. He sustained a head injury (including loss of consciousness), a nasal fracture, post traumatic headaches, cervical, thoracic and lumbar spine injuries, facial laceration, carpal tunnel syndrome, and left shoulder injuries. MRIs reflected bulging discs in the cervical spine, with a tear, bulging discs and a disc herniation in the lumbar spine, for which surgery was recommended. One physician testified that his traumatic brain injury was permanent and that he had brain atrophy

14

and memory loss. The jury's award of $3,833,333.00 in general damages was affirmed on appeal.

We also consider *Wingfield v. State ex rel. Dept. of Trans. and Development*, 01-2668, 01-2669 (La. App. 1 Cir. 11/8/02), 835 So. 2d 785, where the plaintiff, a commercial truck driver, sustained a brain injury that left in him a permanent minimally responsive state when his rig rolled over the railing of a sharply curving I-10 ramp and landed on the highway below. In addition to his brain injury, the plaintiff suffered fractured ribs, numerous abrasions, trauma to the right forearm, a partially detached ear, collapsed lungs, liver laceration, and a fracture of the femur. The jury's award of $5,000,000.00 was reduced by the court of appeal to $3,000,000.00.

In *Odom v. City of Lake Charles*, 00-1950 (La. App. 3 Cir. 1/31/01), 790 So. 2d 51, the court of appeal affirmed a trial judge's general damage award of $4,000,000.00 to the plaintiff, a 29-year-old man whose truck struck an overpass bridge rail on I-10 in Lake Charles and vaulted over the railing onto the street below. He suffered a severe traumatic brain injury rendering him a quadriplegic. He is either bed or wheelchair bound, wears diapers during the day, has a condom catheter at night, and requires 24-hour supervision. He was in the hospital for two months and then transferred to a neurological rehabilitation facility in Houston, where he was treated for five months. He requires a feeding tube because he lost the ability to swallow and to eat. A permanent shunt in his brain drains the buildup of cerebral fluid into his abdomen.

We also look to *Duncan v. Kansas City S. Ry. Co.*, 2000-0066 (La. 10/30/00), 773 So.2d 670, which involved an 11-year-old plaintiff who was thrown from a van and sustained a traumatic brain injury and severed spinal cord injury, which rendered her a quadriplegic and totally dependent on others for all her needs. She suffered other medical complications, including a tracheostomy, a non-functioning left lung,

15

difficulties with digestion and elimination associated with her paralysis, muscle spasms, contractions of her upper and lower extremities, anorexia, and depression. Despite the plaintiff's young age and the severity of her physical and emotional injuries, this Court reduced the jury's $8,000,000.00 general damage award to $6,000,000.00.

In *Simpson v. State Through Dep't of Transp. & Dev.*, 636 So.2d 608 (La. App. 1 Cir. 1993), *as corrected on reh'g* (Mar. 21, 1994), the 15-year-old plaintiff received substantial injuries when the pickup truck in which he was riding went out of control and hit the railing of a trestle bridge. Plaintiff suffered traumatic amputation of both of his legs, a severe head injury and concussion, and emotional and psychological problems as a consequence of the profound injuries which he sustained. The court of appeal found no abuse of discretion in the trial judge's general damage award of $6,000,000.00.

Finally, we consider *Marable v. Empire Truck Sales of Louisiana, LLC*, 16-0876 (La. App. 4 Cir. 6/23/17), 221 So.3d 880, *writ denied*, 2017-1469 (La. 11/13/17), 230 So.3d 210, wherein the plaintiff was pinned underneath the two rear tires of an over-the-road tractor[10] while running alongside the moving vehicle and attempting to turn the ignition key to shut off its engine. The plaintiff sustained an anoxic brain injury leaving her in a permanent, minimally conscious state. She has a tracheotomy and requires 24-hour care for the rest of her life. The jury awarded the plaintiff $40,000,000.00 in general damages, which, while an outlier, was not reduced by this Court.[11]

We find the jury's award in this case, while on the high end of the range of reasonable awards, is not greatly disproportionate to the mass of prior awards. *Pete*,

---

[10] An "over-the-road" tractor is a tractor that pulls a tractor-trailer.
[11] Defendants' application for reconsideration was denied. *Marable v. Empire Truck Sales of Louisiana, LLC*, 2017-1469 (La. 11/17/17), 230 So.3d 212 (Guidry, Clark, and Crichton, JJ., would grant reconsideration and grant the writ application and docket).

16

2023-0170, p. 9, 379 So.3d at 643 (quoting *Reck v. Stevens*, 373 So.2d 498, 501 (La. 1979)). That said, as noted above, "a review of prior awards is not the only factor to be considered in evaluating whether a general damage award is an abuse of discretion; *it is a starting point*." *Id.* While considering the above-described prior awards as a touchstone, we cannot—and must not—overlook "'the facts or circumstances particular to the case under consideration.'" *Id.*, 2023-0170, p. 9, 379 So.3d at 644 (quoting *Malta*, 2021-0209, p. 32, 333 So. 3d at 408). Damage awards are evaluated, in part, by reviewing "the entirety of the evidence in [the] record, viewed in the light most favorable to the prevailing party in the trial court." *Youn*, 623 So.2d at 1261. On rehearing, we find in *Barber I*, this Court did not assign appropriate weight to the effects of "the particular injury to the particular plaintiff under the particular circumstances" *Pete*, 2023-0170, p. 9, 379 So.3d at 643 (quoting *Youn*, 623 So.2d at 1261).

The analysis in *Barber I* did not adequately account for the voluminous and largely unrebutted trial record demonstrating the particularly detrimental effect the injuries have had on Mr. Cushenberry's personality, lifestyle, identity, and self-image. As noted above, the record establishes that before the accident, Mr. Cushenberry was a very active 37-year-old man who participated in sports, worked hard at his physically demanding job, coached his son's sports teams, was heavily involved in his daughter's activities, regularly cooked meals and took care of household duties, volunteered at church, and supported friends and family. As a result of the injuries he suffered in the accident, he is not able to engage in these fulfilling, identity-defining activities. Additionally, he is self-conscious about the facial scarring and permanent hair loss he has sustained. Mr. Cushenberry is keenly aware of his new limitations, altered personality, and transformed appearance, and, as a result, suffers from depression. We further recognize the jury in this case must have accorded significant weight to the strong record of his injuries, impairments,

17

and ongoing suffering. A jury award rests on the "wisdom of the crowd," and thus is accorded much deference. *Eastman v. State Farm Mut. Auto. Ins. Co.*, 2023-1107, p. 1 (La. 5/1/24), 384 So.3d 865, 868. Indeed, we observe that, in large part, the above-described prior awards were determined by a jury and were not altered on appellate review.

Considering the well-documented facts and circumstances particular to this case, in conjunction with a review of prior awards, we cannot conclude that "a rational trier of fact could not have fixed the award[] of general damages at the level set by" this jury. *Youn*¸ 623 So.2d at 1261. The jury's general damage award was not "the result of passion or prejudice," but rather bore a reasonable relationship to the damages which are supported in the evidence presented at trial. *Id.* Therefore, on rehearing we find the jury's award in this case does not "shock the conscience," and does not constitute an abuse of discretion. Thus, *Barber I*'s reduction of the award to $5,000,000.00 was in error and we return the general damage award to $10,750,000.00, subject to the apportionment of fault as confirmed herein.

In *Barber I*, this Court concluded the jury abused its discretion in awarding loss of consortium of $2,500,000.00 to Mrs. Cushenberry and $1,500,000.00 to each minor child. We maintain that conclusion, but on rehearing amend our finding as to the highest loss of consortium awards reasonably within the jury's discretion. To make that determination, we are guided by a consideration of prior awards as well as the effects of Mr. Cushenberry's particular injuries to this particular family under the particular circumstances of this case as established by the evidence at trial.

We begin by considering the loss of consortium awards in the following cases. In *Simon v. American Crescent Elevator*, 99-2058 (La. App. 4 Cir. 4/26/00), 767 So.2d 64, *writ denied*, 2000-1974 (La. 11/13/00), 773 So.2d 726, the jury awarded the wife of the paralyzed plaintiff $900,000.00, and each of his five children received $250,000.00. In *Smith v. Ceasar*, 23-689 (La. App. 3 Cir. 6/26/24), 389 So.3d 1037,

18

*writ denied,* 2024-00944 (La. 11/6/24), the plaintiff was injured in a motor vehicle accident. He underwent multiple spinal and shoulder surgeries and suffered a traumatic brain injury. The jury awarded his wife $475,000.00 for loss of consortium. When their father suffered a brain injury in a car accident, the two children of the plaintiff in *Clement v. Frey*, 95-1119 (La. 1/16/96), 666 So.2d 607, each received $150,000.00.

In *Barber I,* this Court set the loss of consortium awards at $400,000.00 for Mrs. Cushenberry and $100,000.00 for each of the two minor children. In making that determination, this Court considered prior awards, but did not sufficiently account for the negative impact Mr. Cushenberry's extensive injuries have had and will have on his family. On rehearing, we consider the cases above along with the unique facts of this case.

As described above, Mr. Cushenberry can no longer be the same husband to his wife, Robin, or father to his children, Noah and Khloe. Before the accident, he was an equal partner to Robin, contributing to the household in a variety of ways, now he is more like a third child. He was a supportive and involved father to his children, now his participation in their activities is limited. In short, the injuries' effects on Mr. Cushenberry's personality, lifestyle, identity, and self-image, have likewise greatly negatively affected his family. Accordingly, we find the highest award reasonably within the jury's discretion for loss of consortium is $1,000,000.00 to Mrs. Cushenberry and $500,000.00 to each minor child.

**DECREE**

Based on the foregoing, we amend *Barber I* as to general damages to Mr. Cushenberry, returning the award to $10,750,000.00, as found by the jury. We likewise amend the loss of consortium damages to Mrs. Cushenberry to $1,000,000.00 and $500,000.00 each, to Noah and Khloe. All damage awards are

subject to the 20 percent apportionment of fault assigned to Mr. Cushenberry in *Barber I.*

**AFFIRMED AS AMENDED AND RENDERED.**

# SUPREME COURT OF LOUISIANA

### No. 2023-C-00788

### BARBER BROTHERS CONTRACTING COMPANY, LLC

### VS.

### CAPITOL CITY PRODUCE COMPANY, LLC;
### FRANK CUSHENBERRY; AND XYZ INSURANCE COMPANY

### C/W

### FRANK CUSHENBERRY AND ROBIN CUSHENBERRY,
### INDIVIDUALLY AND ON BEHALF OF THE MINOR CHILDREN,
### NOAH CUSHENBERRY AND KHLOE CUSHENBERRY

### VS.

### JOHNNY SCOTT AND BARBER BROTHERS
### CONTRACTING COMPANY, LLC

*On Writ of Certiorari to the Court of Appeal, First Circuit,
Parish of East Baton Rouge*

On Rehearing

**WEIMER, C.J.**, dissenting in part.

I disagree with the majority's reversal (on rehearing) of the prior decision in **Barber Bros. Contracting Co., LLC v. Capital City Produce Co., LLC (Barber I)**, 23-00788, pp. 2, 26 (La 6/28/24), 388 So.3d 331, 338, 353, that the jury abused its discretion in fixing the amount of general damages awarded to Frank Cushenberry and amendment of **Barber I** to reinstate the amount of general damages awarded by the jury. **Barber Bros. Contracting Co., LLC v. Capitol City Produce Co., LLC (Barber II)**, 23-00788, slip op. at 2, 18 (La. 12/__/24) (on reh'g). Unlike the majority on rehearing, I believe that the jury's general damage award was "the result of passion or prejudice," and, like the decision in **Barber I**, does not bear "a reasonable relationship to the elements of the proved damages." See **Youn v. Maritime Overseas Corp.**, 623 So.2d 1257, 1261 (La. 1993). As discussed below,

the jury's award of $10,750,000 in general damages, in my opinion, is so high in proportion to Mr. Cushenberry's injuries that it shocks the conscience. See **Baack v. McIntosh**, 20-01054, p. 10 (La. 6/30/21), 333 So.3d 1206, 1215. Furthermore, I believe that the general damage award by the majority in **Barber I** of $5,000,000 adequately accounted for the impact of the particular injuries on this particular plaintiff under the particular circumstances. Moreover, since the jury did not award an amount for future medical care indicative of future lifelong care for someone suffering from dementia, the jury effectively rejected the plaintiffs' argument that Mr. Cushenberry will more probably than not suffer long-term disability. For this reason, I do not believe that the likelihood of future long-term disability, a likelihood rejected by the jury, justifies an increase in the original general damage award. Likewise, I disagree with the majority's decision on rehearing to substantially increase the loss of consortium awards to Mrs. Cushenberry and the children, as I believe that the amounts originally set by this court in **Barber I** for loss of consortium "sufficiently account for the negative impact Mr. Cushenberry's extensive injuries have had and will have on his family." See **Barber II**, slip op. at 19.

Relative to the assessment of damages, I note special damages can be determined with some degree of pecuniary exactitude. "Special damages are those which either must be specially pled or have a 'ready market value,' *i.e.*, the amount of the damages supposedly can be determined with relative certainty." **Wainwright v. Fontenot**, 00-0492, p. 5 (La. 10/17/00), 774 So.2d 70, 74 (quoting FRANK L. MARAIST & THOMAS C. GALLIGAN, JR., LOUISIANA TORT LAW § 7-2 (Michie 1996) (footnotes omitted)); see **Laday v. Doe**, 10-1110, p. 8 (La.App. 3 Cir. 3/16/11), 59 So.3d 516, 522 ("[S]pecial damages ... can be established to [a] reasonable mathematical certainty, if not with absolute precision."). Special damages, such as

2

medical expenses, property damages, and past and future lost wages, are already, and will continue to be, impacted by inflation.

On the other hand, general damages are not susceptible to determination with pecuniary exactitude. "General damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty." **Wainwright**, 00-0492 at 6, 774 So.2d at 74 (quoting MARAIST & GALLIGAN, *supra*, § 7-2). General damages include "mental or physical pain or suffering, inconvenience, the loss of gratification of intellectual or physical enjoyment, or other losses of life or life-style which cannot really be measured definitively in terms of money." **McGee v. A C AND S, Inc.**, 05-1036, pp. 4-5 (La. 7/10/06), 933 So.2d 770, 774 (quoting **Duncan v. Kansas City Southern Railway Co.**, 00-0066, p. 13 (La. 10/30/00), 773 So.2d 670, 682). Relative to the assessment of general damages, the Consumer Price Index addresses "buying power" and "is a measure of the average change over time in prices paid by urban consumers for a representative basket of consumer goods and services," according to the United States Bureau of Labor Statistics. Overview: Handbook of Methods; U.S. Bureau of Labor Statistics, last modified September 6, 2023, https://www.bls.gov/opub/hom/cpi/ (accessed December 2, 2024). As such, the Consumer Price Index, although used in other matters by the government, is an imperfect touchstone[1] for general damages. The collective common sense of jurors understands the cost of goods and services increases over time.

---

[1] A touchstone is "a test or criterion for determining the quality or genuineness of a thing." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/touchstone (last visited November 21, 2024). A touchstone is not a measurement, a metric, a gauge, a ruler, a barometer, a yardstick, or a calculator, which provides for a more precise calculation.

In sum, special damages will have inflation factored into the award. General damages should be evaluated based on "prior awards in truly similar cases"[2] without regard to an "inflation" factor. With the breadth of data now available and the ease of research because of technological advances, reviewing courts can better determine if an award is so high or so low that it "shocks the conscience."[3] As discussed *infra*, roughly six decades of evaluating damages since 1960 has amassed a body of material that can be used to provide some sense of objectivity in the initial inquiry in the review of a general damage award, an objectivity which has escaped the courts despite the copious amount of ink spilled in attempting to determine whether an award is an abuse of discretion, whether that be too high or too low.

It should be noted that, although some cases have indicated that "great" or even "vast"[4] discretion is afforded to the factfinder in the assessment of damages, La. C.C. art. 2324.1 provides that "[i]n the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, **much discretion** must be left to the judge or jury." (Emphasis added.) Clearly, La. C.C. art. 2324.1 does not state that unbridled or unlimited discretion is vested in the factfinder in this regard. See **Fletcher v. Simmons**, 37,758, p. 7 (La.App. 2 Cir. 10/29/03), 859 So.2d 292, 296 ("the discretion afforded the trial court in assessing damages ... is not unbridled."). Because of the

---

[2] **Pete v. Boland Marine & Mfg. Co., LLC**, 23-00170, p. 12 (La. 10/20/23), 379 So.3d 636, 645.

[3] See **Baack**, 20-01054 at 10, 333 So.3d at 1215 (citing **Riley v. Maison Orleans II, Inc.**, 01-0498, p. 11 (La.App. 4 Cir. 9/25/02), 829 So.2d 479, 487).

[4] See **Reck v. Stevens**, 373 So.2d 498, 501 n.3 (La. 1979) (citing Webster's Third New International Dictionary, 1481 (1961)) (defining "much" discretion as "[t]he trial court's great discretion, or its discretion to a considerable degree."); **Youn**, 623 So.2d at 1261 ("the discretion vested in the trier of fact is 'great,' and even vast."); **Duncan**, 00-0066 at 13, 773 So.2d at 682 ("Vast discretion is accorded to the trier of fact in fixing general damage awards."); **Wainwright**, 00-0492 at 6, 774 So.2d at 74 ("[t]he assessment of 'quantum,' or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review."); **Jones v. Mkt. Basket Stores, Inc.**, 22-00841, p. 15 (La. 3/17/23), 359 So.3d 452, 464 ("vast discretion is accorded to the trier of fact in fixing general damage awards.").

4

discretion afforded to the factfinder, "the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact." **Youn**, 623 So.2d at 1260; see also **Jones v. Mkt. Basket Stores, Inc.**, 22-00841, p. 16 (La. 3/17/23), 359 So.3d 452, 464; **Duncan**, 00-0066 at 13, 773 So.2d at 682; **Howard v. Union Carbide Corp.**, 09-2750, p. 5 (La. 10/19/10), 50 So.3d 1251, 1256.

There has been some misunderstanding about this court's pronouncement in **Pete v. Boland Marine & Mfg. Co., LLC**, 23-00170 (La. 10/20/23), 379 So.3d 636, concerning the use of prior awards in truly similar cases as a factor in determining whether there has been an abuse of discretion by the jury in fixing a general damage award. I agree with the majority's detailed analysis as to why **Pete** is correct in this regard. See **Barber II**, 23-00788, slip op. at 4-6. Accordingly, in **Pete**, this court simply incorporated an element of objectivity–"a reasonable criterion"[5]–into a reviewing court's determination of whether an award is abusively high or low based on what has been done through the decades in practice by attorneys in estimating the value of a case and by courts in assisting in the determination of whether an award shocks the conscience so as to constitute an abuse of discretion.[6]

Long ago, for guidance in evaluating the value of a case, the bench and bar looked to a quantum study that was first published in 1973 by the Loyola Law Review-Comment, A Quantum Study of Pain and Suffering Awards for All Personal

---

[5] **Pete**, 23-00170 at 8, 379 So.3d at 643.

[6] See **Reck**, 373 So.2d at 501 (citing **Coco v. Winston Indus., Inc.**, 341 So.2d 332, 334 (La. 1976)) ("In the initial determination of excessiveness or insufficiency, an examination of prior awards has a limited function if indeed the facts and circumstances of the prior awards are closely similar to the present. The prior awards may serve as an aid in this determination only where, on an articulated basis, the present award is shown to be greatly disproportionate to past awards (not selected past awards, but the mass of them) for (truly) 'similar' injuries.").

Injuries in Louisiana Appellate Courts (1968-1972), 19 Loy. L. Rev. 111 (1973). As stated in Louisiana Personal Injury Awards, 51 Loy. L. Rev. 603 (2005):

> The original purpose of the Quantum Study was to create a simple and brief process for searching for damage awards, which would aid practicing attorneys in reaching an accurate assessment of the monetary value of a case. Since 1973, the Loyola Law Review has continued to publish its Quantum Study on a regular basis. In recent years, the Quantum Study has been published annually. Throughout this time, the purpose has remained the same-provide an easy, accurate, and inexpensive method for practicing attorneys to evaluate the monetary worth of a case.
>
> . . . .
>
> The usefulness and limitations of the Quantum Study are readily apparent. The study should not lead one to believe that damage awards are susceptible to precise estimation. Instead, the reader should keep in mind that Louisiana courts are vested with much discretion when determining damage awards.

*Id.* at 603-04. More recently, the bench and the bar have also had the benefit of Eason's Louisiana Quantum Study and Personal Injury Law by Jamie H. Eason and Tobin J. Eason as an aid in the evaluation of a case's worth. As the number of personal injury cases that have evaluated general damage awards amass over time, more data is available to assist with and aid in the determination of whether an award is abusively high or abusively low such that its shocks the conscience, while being mindful that "damage awards are [not] susceptible to precise estimation"[7] in light of the factual differences presented in each case, even in truly similar cases.

For these reasons, the opinion in **Pete** is not remarkable nor is the original majority opinion in this case in its application of **Pete**. See **Barber I**, 23-00788 at 33-36, 388 So.3d at 357-58.

Considering the particular facts and circumstances of this case, in conjunction with other factors including a review of prior awards in cases with truly similar

---

[7] Louisiana Personal Injury Awards, 51 Loy. L. Rev. at 604.

6

injuries,[8] as **Pete** directs, I agree with the majority's conclusion in **Barber I** that the jury abused its discretion in fixing Mr. Cushenberry's general damage award at $10,750,000.

Plaintiffs seek to justify the jury's award of $10,750,000 in general damages by pointing to the awards in **Odom v. City of Lake Charles**, 00-01050 (La.App. 3 Cir. 1/31/01), 790 So.2d 51 ($4,000,000); **Duncan v. Kansas City S. Ry. Co.**, 00-0066 (La. 10/30/00), 773 So.2d 670 ($8,000,000); **Simpson v. State, Dep't of Transp. & Dev.**, 636 So.2d 608 (La.App. 1 Cir. 1993), as corrected on reh'g (3/21/94) ($6,000,000); and **Marable v. Empire Truck Sales of Louisiana, LLC**, 16-0876 (La.App. 4 Cir. 6/23/17), 221 So.3d 880 ($40,000,000). However, the injuries suffered by the plaintiffs in those cases are not "truly similar" to those suffered by Mr. Cushenberry. Those plaintiffs were left severely physically disabled (comatose, paralyzed, or a bilateral amputee) and heavily, if not entirely, reliant on the care of others for the activities of daily living–a clear and objective distinction from the effect of Mr. Cushenberry's injuries. Plaintiffs do not provide, and I have likewise not uncovered, any case were a party endured injuries that are truly similar Mr. Cushenberry's injuries and was awarded damages approaching the extent of the jury award in this case. On the other hand, in **Brewer v. J.B. Hunt Transp., Inc.**, 09-1408 (La. 3/16/10), 35 So.3d 230 ($2,500,000); **Jenkins v. State ex rel. Dep't of Transp. & Dev.**, 06-1804 (La.App. 1 Cir. 8/19/08), 993 So.2d 749 ($3,000,000); and **Sabillon v. Max Specialty Ins. Co.**, 13-0513 (La.App. 4 Cir. 3/12/14), 137 So.3d 707 ($3,833,333), where the plaintiffs suffered injuries more comparable to those

---

[8] See **Reck**, 373 So.2d at 501 (citing **Coco**, 341 So.2d at 334).

7

sustained by Mr. Cushenberry, the general damages were, across the board, far less than those awarded by the jury here.

I acknowledge the detrimental effect these injuries have had on Mr. Cushenberry, a highly active and involved family man. Nonetheless, I believe that the majority of this court in **Barber I** correctly found that the jury abused its discretion in setting the general damages at $10,750,000, an amount that is so high in proportion to the injuries that it shocks the conscience.

Having considered "the effects of the particular injury to the particular plaintiff under the particular circumstances," I do not believe that Mr. Cushenberry's general damage award by the majority of this court in **Barber I** warrants modification on rehearing.

Accordingly, I respectfully dissent from that portion of the majority opinion on rehearing that finds no abuse of discretion in the jury's award of general damages to Mr. Cushenberry, that reinstates the jury's award of $10,750,000 in general damages, that more than doubles the $400,000 loss of consortium award to Mrs. Cushenberry made by the majority of this court in **Barber I** to $1,000,000, and that fivefolds the $100,000 loss of consortium award to each child made by the majority of this court in **Barber I** to $500,000. In all other respects, I agree with the majority opinion on rehearing.

# SUPREME COURT OF LOUISIANA

## No. 2023-C-00788

## BARBER BROTHERS CONTRACTING COMPANY, LLC

## VS.

## CAPITOL CITY PRODUCE COMPANY, LLC; FRANK CUSHENBERRY; AND XYZ INSURANCE COMPANY

## C/W

## FRANK CUSHENBERRY AND ROBIN CUSHENBERRY, INDIVIDUALLY AND ON BEHALF OF THE MINOR CHILDREN, NOAH CUSHENBERRY AND KHLOE CUSHENBERRY

## VS.

## JOHNNY SCOTT AND BARBER BROTHERS CONTRACTING COMPANY, LLC

*On Writ of Certiorari to the Court of Appeal, First Circuit, Parish of East Baton Rouge*

On Rehearing

**KNOLL, Justice *Pro Tempore*,[1] additionally concurs and assigns reasons.**

Both the present case, *Barber II*, and *Pete v. Boland Marine and Mfg. Co., LLC*, 23-0170 (La. 10/20/23), 379 So. 3d 636, demonstrate this Court's admirable efforts to bring improved analysis for our state courts' review of quantum awards. This is a truly difficult judicial task dating back to our nebulous judicial system.[2]

The first time the term "manifest error" appeared in our jurisprudence was in 1823 in the case *Moore v. Angioletto*, 12 Mart. (o.s.) 532 (La. 1823).[3] The manifest error doctrine remains the bedrock of our judicial review system to this very day.

---

[1] * Justice Jeannette Theriot Knoll, retired, appointed Justice *Pro Tempore*, sitting for the vacancy in Louisiana Supreme Court District 3.

[2] Our review of fact from a cold record started in 1816. Judge Jeannette Theriot Knoll, La. App. 3rd Cir., LOUISIANA UNIQUENESS: ORIGIN AND APPLICATION OF APPELLATE REVIEW OF FACT IN CIVIL CASES, University of Virginia School of Law, pp. 8, 17 (1996).

[3] *Id.* at 28.

1

This doctrine has been explained in more recent fountainhead cases[4] that reviewing courts should heavily rely upon when determining whether the trial judge or jury abused its much discretion in awarding an abusively low or an abusively high damage award for personal injuries.

By nature, the review of a personal injury case is subjective because the review concerns a particular plaintiff and his/her particular injury in a particular circumstance. These three "particulars" are the important subjective aspects of the review that should aid the reviewing court in amending an abusive damage award. The particulars act as guardrails from arbitrariness when the reviewing court amends a damage award.

The reviewing court cannot make an *objective* award for *personal* injuries as this is internally inconsistent and renders the analysis erroneous. An objective analysis would lead to arbitrary awards influenced by factors outside the scope of the particular plaintiff, particular injuries, and particular circumstances. This is why amending damage awards is difficult—it is not an objective analysis, but rather a subjective analysis to a particular plaintiff, his/her particular injuries, and the particular circumstances presented.

The jury is given great deference and has wide discretion. Rarely should a jury award of general damages be disturbed, as recognized in *Reck v. Stevens*, 373 So. 2d 498 (La. 1979). Importantly, the jury represents the community's input in the judicial system in achieving justice in a particular case:

> [T]he jury trial plays a major role in achieving an important societal policy which the law is designed to foster: satisfaction of the community's sense of what is fair and just. […] Criticisms of jury trials as costly and of jury decisions as sometimes irrational, although valid observations, must be weighed against the societal good which is achieved by the resolution of disputes through jury trials.

---

[4] *See, e.g., Gaspard v. LeMaire*, 245 La. 239, 158 So. 2d 149 (1963); *Coco v. Winston Industries, Inc.*, 341 So. 2d 332 (La. 1977); *Reck v. Stevens*, 373 So. 2d 498, 499 (La. 1979); *Youn v. Maritime Overseas Corp.*, 623 So. 2d 1257, 1261 (La. 1993); *Thibodeaux v. Donnell*, 16-0570 (La. 1/20/17), 219 So. 3d 274.

Frank L. Maraist, 1 La. Civ. L. Treatise, Civil Procedure § 11:2 (2d ed.) (November 2021 Update).

Prior to *Pete*, we recognized *Gaspard v. LeMaire*, 245 La. 239, 158 So. 2d 149 (1963), as the "fountainhead decision of modern jurisprudence" for the interpretation and application of Louisiana law granting juries much discretion in deciding quantum awards.[5] Later, in *Reck*, this Court reversed and reinstated the trial court's damage award because the appellate court failed to consider the particular effects of the particular injuries upon the particular plaintiff in that matter.[6] As noted by Professors Saul Litvinoff and Ronald J. Scalise, Jr.:

> [T]he highest court of the state declared that the role of the appellate court in reviewing an award of general damages is not to decide what kind of award would be appropriate, but rather to review the way in which the trier of fact exercised its discretion and, because each case is different, to determine the adequacy or inadequacy of the reviewed award in light of the circumstances particular to the case under consideration.

Saul Litvinoff and Ronald J. Scalise Jr., 6 La. Civ. L. Treatise, Law Of Obligations § 8.9 (2d ed.) (November 2023 Update). *See Youn v. Maritime Overseas Corp.*, 623 So. 2d 1257, 1261 (La. 1993).

Turning to the present case, we correctly reinstated the jury's general damages award to Mr. Cushenberry. The jury did not abuse its much discretion to this particular plaintiff for his particular injuries under the particular circumstances of the accident. While the introduction of prior awards can be considered when navigating abusively low or abusively high quantum awards in personal injury cases, it shall not take precedence over the personal, particular, subjective elements of the case that make it unique. *Barber I* failed in this respect, and we have corrected it here in *Barber II* by recognizing "no two cases will be identical."[7]

---

[5] *Reck*, 373 So. 2d at 499.

[6] *Id.* at 500-01.

[7] *Barber II*, 23-0788, p. 5.

**SUPREME COURT OF LOUISIANA**

**No. 2023-C-00788**

**BARBER BROTHERS CONTRACTING COMPANY, LLC**

**VS.**

**CAPITOL CITY PRODUCE COMPANY, LLC; FRANK CUSHENBERRY; AND XYZ INSURANCE COMPANY**

**C/W**

**FRANK CUSHENBERRY AND ROBIN CUSHENBERRY, INDIVIDUALLY AND ON BEHALF OF THE MINOR CHILDREN, NOAH CUSHENBERRY AND KHLOE CUSHENBERRY**

**VS.**

**JOHNNY SCOTT AND BARBER BROTHERS CONTRACTING COMPANY, LLC**

On Writ of Certiorari to the Court of Appeal, First Circuit, Parish of East Baton Rouge

On Rehearing

**CRAIN, J.**, dissents with reasons.

I agree with the analysis and the conclusion in *Barber Bros. Contracting Co., LLC v. Capitol City Produce Co., LLC,* 2023-00788 (La. 6/28/24), 388 So.3d 331 ("*Barber I*"). I do not believe it is necessary to clarify either *Barber I* or *Pete v. Boland Marine and Manufacturing Company, LLC*, 2023-0170 (La. 10/20/23), 379 So.3d 636. Because both *Barber I* and *Pete* were decided correctly, I dissent.